ATTORNEYS FOR APPELLANT
Paul Helmke
Fort Wayne, Indiana

Joe Conner
Misty Smith Kelley
Chattanooga, Tennessee

ATTORNEYS FOR AMICI CURIAE
INDIANA-AMERICAN WATER
COMPANY, INC., AMERICAN SUBURBAN
UTILITIES, INC., SANI TECH, INC., EASTERN
HENDRICKS COUNTY UTILITY, INC., AND
SOUTHEASTERN UTILITIES, INC.
Daniel W. McGill
Nicholas K. Kile
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
INDIANA ASSOCIATION OF SEWER COMPANIES,
HAMILTON SOUTHEASTERN UTILITIES, INC.,
RIVERSIDE WATER COMPANY, INC., EASTERN
BARTHOLOMEW WATER CORPORATION, AND
EDWARDSVILLE WATER CORPORATION
J. Christopher Janak
Ty H. Conner
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Karl L. Mulvaney
Randolph L. Seger
Brian W. Welch
Christopher M. York
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
INDIANA ASSOCIATION OF CITIES AND
TOWNS AND INDIANA MUNICIPAL LAWYERS
ASSOCIATION
Adam Arceneaux
Brian E. Bailey
Indianapolis, Indiana

# In the
# Indiana Supreme Court

### No. 02S04-0706-CV-248

UTILITY CENTER, INC., D/B/A AQUASOURCE,

*Appellant (Plaintiff below),*

v.

CITY OF FORT WAYNE, INDIANA,

*Appellee (Defendant below).*

Appeal from the Allen Circuit Court, No. 02C01-0207-PL-92
The Honorable Thomas J. Felts, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 02A04-0410-CV-576

_____

**June 22, 2007**

**Sullivan, Justice.**

Water and sewer service is provided in Indiana cities by the municipalities themselves or by private, investor-owned utilities. In this case, a municipality seeks to acquire a portion of the operations of a privately-owned utility that serves a portion of the City recently annexed. We hold that it may do so pursuant to the requirements of Indiana's general eminent domain statute.

## Background

The City of Fort Wayne owns and operates a sewer and water utility. Utility Center, Inc., d/b/a Aquasource, is a for-profit corporation that operates a public utility that provides sewer and water service in and around Fort Wayne.

Pursuant to Indiana's general eminent domain statute, Ind. Code §§ 32-11-1.5 et seq. (now I.C. §§ 32-24-2 et seq.[1]), the City initiated condemnation proceedings against Utility Center's North System,[2] which serves a portion of the City recently annexed. Utility Center filed a complaint against the City seeking declaratory and injunctive relief from the condemnation, on grounds that the City was not following proper condemnation procedure. The City filed a counterclaim seeking declaratory relief of its own, contending that Utility Center was required by law to consent to municipal purchase of its facility. The parties filed cross motions for summary judgment.

_____

[1] As noted infra, from time to time the Code is recodified; the change to the instant citation is the result of the Recodification Act of 2002. See I.C. § 32-16-1.

[2] Utility Center's water and sewer facilities are divided into two geographic units, the North System and the larger Aboite System; the Aboite System is not at issue in this matter.

2

The trial court granted the City's motion and denied Utility Center's. The Court of Appeals reversed and remanded. Utility Center, Inc. v. City of Fort Wayne, 834 N.E.2d 686 (Ind. Ct. App. 2005). We grant the City's petition for transfer.

**Discussion**

**I**

Resolving the dispute in this case requires us to analyze not just the language that the Legislature has used in statutes affecting the ability of municipalities to purchase privately-owned water and sewer utility property but also the location of that language in the Indiana Code. For this reason, we believe a brief introduction to the way in which the Legislature organizes the laws it enacts would be helpful.

For many years, a private concern collected and arranged systematically the statutes enacted by the Legislature and published them as "Burns Annotated Statutes." Some of the legislative enactments at issue in this case date to this period of time. In 1971, the Legislature itself codified its enactments into an official "Indiana Code." Since that time, new statutes and changes to old ones have, for the most part, been adopted as amendments to the Indiana Code. These amendments effect substantive change in Indiana law.

In addition, from time to time, the Legislature, under the auspices of an Indiana Code Revision Commission, consolidates and updates the provisions in the Indiana Code to make it clearer, more concise, and easier to interpret and apply. These "re-codification" projects are expressly designed not to change existing law; language is included in re-codification bills saying precisely that. Occasionally there is a slip between the cup and the lip but when that occurs, the courts have been firm in holding that no change in substantive or procedural law is effected by a re-codification. See, e.g., State v. Wilson, 836 N.E.2d 407, 413-14 (Ind. 2005); Burd Mgmt., LLC v. State, 831 N.E.2d 104, 107-08 (Ind. 2005).

The Indiana Code itself is now divided by subjects into 36 "titles." (Title 8 contains the laws dealing with utilities; title 32 the laws dealing with the acquisition of property by eminent domain.) Each title is further divided, first into "articles," then into "chapters," and then into "sections." This organization is easily understood, thanks to a citation scheme that separates each of these divisions by hyphens. For example, Ind. Code § 1-2-3-4 stands for section 4 of chapter 3 of article 2 of title 1 of the Indiana Code.

**II**

In 1913, the Legislature enacted a comprehensive statute governing utilities often referred to as the Shively-Spencer Utility Commission Act (the "Shively-Spencer Act"). Acts 1913, ch. 76 at 167. As part of the 1971 codification, the Shively-Spencer Act, as it had been amended over time, became chapter 2 of article 1 of title 8 (I.C. § 8-1-2).

The Shively-Spencer Act conditioned investor-owned utility licenses, permits, and franchises on the ability of municipalities to purchase utility property. These provisions are now codified in sections 92 and 93 of chapter 2 of article 1 of title 8 of the Indiana Code (I.C. §§ 8-1-2-92 & 93), as follows:

> Every license, permit, or franchise granted after April 30, 1913, to any public utility shall have the effect of an indeterminate permit subject to the provisions of this chapter, and subject to the provisions that the license, franchise, or permit may be revoked by the commission for cause or that the municipality may purchase the property of such public utility, as provided in this section. Any such municipality is authorized to purchase such property and every such public utility is required to sell such property at the value and according to the terms and conditions as provided in this chapter.

I.C. § 8-1-2-92.

> Any public utility accepting or operating under any indeterminate license, permit, or franchise granted after April 30, 1913, shall by acceptance of any such indeterminate license, permit, or franchise be deemed to have consented to a future purchase of its property including property located in contiguous territory within six (6) miles of the corporate limits of such municipality by the municipality in

4

which such utility is located, at the value and under the terms and conditions as provided in this chapter, and shall thereby be deemed to have waived the right of requiring the necessity of such taking to be established by the judgment of a court, and to have waived all other remedies and rights relative to condemnation, except such rights and remedies as are provided in this chapter and shall have been deemed to have consented to the revocation of its license, permit, or franchise by the commission for cause.

I.C. § 8-1-2-93.

In 1999, the Legislature enacted a new statute concerning utilities. This law, among other things, added a new chapter 30 to article 1 of title 8 (I.C. § 8-1-30). This new chapter 30 has six sections, as follows:

- The first section provides that the definitions contained in Ind. Code § 8-1-2-1 apply to chapter 30.

- The second section provides a special definition for the term "utility company" as either (1) a public utility that provides water or sewer service or (2) a regional sewer and water district; but not a municipally-owned utility.

- The third section provides the Indiana Utility Regulatory Commission (IURC) authority to review a utility company's (1) technical, financial, and managerial capacity; (2) physical condition and capacity of the utility company's plant; (3) compliance with Indiana or federal law or the commission's orders; and (4) provision of service to customers. The IURC is authorized to conduct such a review on the basis of its own motion, a request of the Office of the Utility Consumer Counselor, or the filing of a complaint by a customer of the utility company, so long as the commission's order for review states facts to justify the review.

- The fourth section provides that the IURC may order certain remedial action (specified in the fifth section) if the IURC concludes that the utility company has (1) continued violations of (a) law regulating the utility company after the commission has ordered compliance

or (b) commission orders; or (2) severe deficiencies that the utility company has failed to remedy.

- The fifth section sets forth the remedial measures that the IURC may take if it finds either continuing violations or severe deficiencies on the part of a utility company of the sort specified in the fourth section. These consist of (1) providing for the acquisition of the subject utility company or (2) providing for the appointment of a receiver to operate the subject public utility. The fifth section goes on to specify procedural and substantive requirements with respect to these remedies.[3]

- The sixth section provides as follows:

> A municipality or other governmental unit may not require a utility company that provides water or sewer service to sell property used in the provision of such service to the municipality or governmental unit under IC 8-1-2-92, IC 8-1-2-93, or otherwise, unless the procedures and requirements of this chapter have been complied with and satisfied.

Stated simply, the question before the Court is whether this sixth section of chapter 30 (I.C. § 8-1-30-6) abrogates or restricts the City's authority to condemn Utility Center's property pursuant to sections 92 and 93 of chapter 2 (I.C. §§ 8-1-2-92 & 93). We hold that it does not.

---

[3] The substantive requirements with respect to the acquisition remedy are "(1) that the person acquiring the subject utility company must pay the fair market value of the subject utility company at the time of acquisition; and (2) the specific accounting methods and appraisal procedures and terms by which the fair market value of the subject utility company is to be determined." In addition, when the IURC orders an acquisition under chapter 30, it "may provide cost recovery mechanisms for costs associated with improvements to the acquired system that are immediate and necessary to remedy deficiencies, including any of the following:

    (1) A mechanism for expediting any adjustments to the rate base and rates of the person acquiring the subject utility company.
    (2) Surcharges on customers of the acquired utility company system to pay for extraordinary costs.
    (3) A plan for deferring certain improvement costs and recovering costs in phases.
    (4) A plan for equalizing rates of the subject utility company with the rates of the person acquiring the subject utility company, if necessary.
    (5) Other incentives to the person acquiring the subject utility company, including adjustments to the allowed rate of return."

I.C. § 8-1-30-5(d) & (e).

The Court of Appeals held that Ind. Code § 8-1-30-6 applied to the City's efforts to acquire Utility Center's property because the language of section 6 applies to any attempt by a municipality to acquire property from a private water or sewer utility. The Legislature could have limited the circumstances to which section 6 applies, the Court of Appeals said, but it did not. Utility Center, 834 N.E.2d at 698. We, however, believe the language in section 6 must be read in the context of the rest of chapter 30. See Robinson v. Wroblewski, 704 N.E.2d 467, 474 (Ind. 1998) ("In construing a statutory provision, we must consider the statute as an entirety, with each part being viewed not as an isolated fragment but with reference to all the other companion provisions." (quoting Hinshaw v. Bd. of Comm'rs of Jay County, 611 N.E.2d 637, 639 (Ind. 1993))). We hold that section 6 applies only to a utility company that has been the subject of the remedial measures identified in the preceding sections of chapter 30.

We say this because it is clear that the substantive purpose of chapter 30 is to grant authority to the IURC to deal with public water and sewer utilities that have encountered legal or financial difficulties. See I.C. § 8-1-30-4. As described in greater detail above, section 3 of chapter 30 sets forth the authority of the IURC to investigate a private water or sewer utility's legal and financial affairs on the basis of its own motion, a request of the Office of the Utility Consumer Counselor, or the filing of a complaint by a customer of the utility company. Then section 4 of chapter 30 authorizes the IURC to take remedial action with respect to those (but only those) private water and sewer utilities with respect to which the commission finds "continuing violations" or "severe deficiencies." Next, chapter 5 of chapter 30 sets forth the remedial authority the IURC enjoys to direct the acquisition of the subject utility company or provide for the appointment of a receiver. We think that it would be totally inconsistent with the purpose and structure of chapter 30 taken as a whole to say that section 6 of chapter 30 applies to all private sewer and water utilities, rather than only to those subject to investigation under section 3, findings of "continuing violations" or "severe deficiencies" under section 4, and a remedial order under section 5.

Said differently, we hold that the single sentence that is section 6 limits only a municipality's ability to disrupt an order of the IURC issued under section 5. That is, the limitation permits the procedures articulated in section 5 to operate without "municipality or other governmen-

tal" interruption.  Absent the language in section 6, a conflict might develop as to which government entity has priority with respect to the rehabilitation of a "troubled utility," the municipality or the IURC.  See Cemetery Co. v. Warren Sch. Tp. of Marion Co., 236 Ind. 171, 139 N.E.2d 538, 544 (1957) (noting it is within the Legislature's power to grant one governmental entity a superior or overriding power over another to exercise eminent domain).  But, outside the context of "troubled utilities," section 6 has no application.

Although we think this result is dictated by the language of chapter 30 itself, we find support for our conclusion in two other places.

First, we note that when the Legislature prohibited condemnation of electric utilities by municipalities (and other entities), the limiting provision used "clear and unambiguous language" to that effect.  That Indiana Code section reads:

> Notwithstanding any other provision of this chapter, after February 29, 1980, a municipality, public utility, or corporation organized under IC 8-1-13 may not bring any action in the circuit or superior court of any county against any corporation organized under IC 8-1-13 or any public utility as defendant for the condemnation of its electric utility property for the use of the property in providing electric utility service.

I.C. § 8-1-2-95.1.  There is no comparable prohibition in Ind. Code § 8-1-30-6.

Second, the IURC, in 2001, itself was presented with a question similar to the one presented in this case.  The IURC was asked whether section 6 would apply if the City of Indianapolis were to acquire the property of a private water utility.  The commission held that section 6 limits only a municipality's eminent domain authority where the utility is the subject of an investigation initiated under section 3 of chapter 30.  In re Petition of the City of Indianapolis, No. 41821, 2001 Ind. PUC LEXIS 109 (Feb. 9, 2001).  The "interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless [the] interpretation would be inconsistent with the statute itself."  LTV Steel Co. v. Griffin, 730 N.E.2d 1251, 1257 (Ind. 2000).

Finally, we make note of the fact that Senator David C. Long, the author of chapter 30 when it was enacted by the Legislature in 1999, filed an affidavit and supporting exhibits with the trial court in this matter, explaining his "intent as the author" of the statute. The trial court declined to consider the affidavit and the Court of Appeals affirmed, reflecting this Court's policy that "[i]n interpreting statutes, we do not impute the opinions of one legislator, even a bill's sponsor, to the entire legislature unless those views find statutory expression." A Woman's Choice-East Side Women's Clinic v. Newman, 671 N.E.2d 104, 110 (Ind. 1996) (citing O'Laughlin v. Barton, 582 N.E.2d 817, 821 (Ind. 1991)).

Senator Long's affidavit has also been presented to us as an addendum to an amicus brief. In it, Senator Long noted:

> [Chapter 30] sought to create an incentive for a private or municipal utility to take over a troubled utility and make the necessary investment to bring that troubled utility back to health. Prior to the enactment of [chapter 30], the IURC really had no way to take away the operation of a troubled utility from its owner, place that utility in receivership, and then provide an opportunity and incentive to an investor to purchase that utility and make the necessary investments in the utility to restore adequate service to the customers.

(Long Aff. ¶ 8, Addend. to Br. of Amici Curiae Ind. Ass'n of Sewer Companies et al. at 2). As should be apparent, this description comports with our reading of what the language of the bill enacted by the Legislature as chapter 30 actually did.

Senator Long's affidavit also said that his intent, as the author, was to prevent "a municipal utility from using its powers of eminent domain to take over the ownership of a healthy private utility." (Long Aff. ¶ 9, Addend. to Br. of Amici Curiae Ind. Ass'n of Sewer Companies et al. at 3). We respect Senator Long's work in this field but, for the reasons set forth above, are unable to conclude that his intent in this regard was enacted into law.

We hold that Ind. Code § 8-1-30-6 does not abrogate or restrict a municipality's existing authority to condemn utility property pursuant to Ind. Code §§ 8-1-2-92 & 93 except with respect to utilities subject to orders under Ind. Code § 8-1-30-5.

**III**

As an alternative to the argument discussed in part II <u>supra</u>, Utility Center argues that if the City is authorized to acquire its property, the City must follow procedures set forth in Ind. Code § 8-1.5-2, including conducting a public referendum. The City counters that it is entitled to follow the procedures for eminent domain generally applicable to municipalities that are set forth in Ind. Code §§ 32-24-1 & 2. Because of the way in which it resolved this case, the Court of Appeals did not address this contention.

We return to the 1913 Shively-Spencer Act and its provisions, now codified at Ind. Code §§ 8-1-2-92 & 93. As noted <u>supra</u>, these sections condition investor-owned utility licenses, permits, and franchises on the authority of municipalities to purchase utility property. The predecessor to § 92 first established municipal condemnation power in this regard: "Any municipality shall have the power, subject to the provisions of this act to acquire by condemnation the property of any public utility . . . ." Acts 1913, ch. 76, § 103 at 202.

In addition to granting a municipality the authority to condemn, the Shively-Spencer Act also provided condemnation procedures. In 1933, the Shively-Spencer Act was amended and a referendum requirement was added: "No municipal council or municipality shall have the authority or power to condemn . . . a public utility property unless the said condemnation . . . shall have been submitted to and approved by the voters of said municipality." Acts 1933, ch. 190, § 18(a) at 953. In the 1971 codification, the referendum requirement was included in Ind. Code § 8-1-2-99.

The parties' disagreement is over the impact of the Legislature's enactment in 1982 of a new article 1.5 in title 8. P.L. 74-1982. Article 1.5, which now contains six chapters, sets forth provisions governing municipal utilities. Its enactment in 1982 was accompanied by the repeal of ten sections of Ind. Code § 8-1-2. Hearkening back to part I of this opinion, our reading of these 1982 changes is that these were substantive changes rather than a re-codification; there is no language in P.L. 74-1982 suggesting that it was not intended to change prior law.

10

The sections of article 1.5 that generate the debate here are found in chapter 2. They read in relevant part:

§ 15. Condemnation and eminent domain.

(a) If the municipality and the owners of a public utility are unable to agree upon a price to be paid for the property of the public utility, the municipality may:

(1) by ordinance declare that a public necessity exists for the condemnation of the utility property; and

(2) bring an action in the circuit or superior court of the county where the municipality is located against the utility for the condemnation of the property.

(b) An ordinance adopted under subsection (a) is final.

(c) For the purpose of acquiring the property of a public utility, the municipality:

(1) may exercise the power of eminent domain in accordance with IC 32-24[4]; and

(2) is required only to establish the necessity of taking as this chapter requires.

. . .

§ 16. Ordinances requiring voter approval.

(a) A municipal legislative body may not adopt an ordinance . . . under section 15 [IC 8-1.5-2-15] of this chapter for the purpose of condemning the property of a public utility; without first submitting the question of the construction, acquisition, or condemnation to the voters of the municipality at a special or general election.

. . .

I.C. §§ 8-1.5-2-15 & 16.

Utility Center contends that if the City is to acquire its property, it must proceed according to the requirements of section 15, one of which is the referendum requirement of section 16. The City argues that even if section 15 is applicable in this situation, it has the option of proceeding either under mutually exclusive subsections 15(a) or 15(c). And while it acknowledges that the referendum requirement of section 16 is applicable if it chooses to proceed under subsection

---

[4] Indiana Code § 32-24 sets forth the general procedures that municipalities must follow in acquiring property by eminent domain, as discussed infra.

11

15(a), the City contends section 16 is not applicable if it chooses to proceed under subsection 15(c).

We agree with the City's reading. We believe Ind. Code § 8-1.5-2-15 details two alternative methods for condemning a utility outright or acquiring utility property. Method one provides that the municipal legislative body may, after it passes an ordinance declaring the existence of a public necessity, petition the circuit or superior court to condemn the property. I.C. § 8-1.5-2-15(a). By its terms, section 16 requires a referendum prior to the adoption of such an ordinance. I.C. § 8-1.5-2-16.

Method two provides that the municipal legislative body, to determine compensation, may proceed under Ind. Code § 32-24, the general eminent domain statute. I.C. § 8-1.5-2-15(c). Because section 15 does not require the adoption of an ordinance for a municipality to proceed in this way, section 16's referendum requirement is not applicable.

We make several concluding observations is support of this result.

First, it is clear to us that the 1982 changes that established article 1.5 – the municipal utilities article – in title 8 effected a substantive change in the referendum requirement. Prior law (I.C. § 8-1-2-99(a)), providing that "[n]o municipal council or municipality shall have the authority or power to condemn, lease, erect, establish, construct, purchase or acquire a public utility property unless said condemnation, leasing, erecting, construction, purchase, or acquisition shall have been submitted to and approved by the voters of said municipality," was repealed. The only comparable language enacted in the new article 1.5 was that of section 16 set forth above. And its predicate in section 15(a) is permissive, not mandatory: a "municipality may . . . by ordinance declare . . . ."

Second, reading the Legislature as subjecting utilities to the general eminent domain statute seems to us entirely consistent with the dictates of Ind. Code §§ 8-1-2-92 & 93 set out early on in this opinion. A utility like Utility Center holds an indeterminate permit subject to the au-

12

thority of a municipality like the City to purchase its property. Such a utility does not have the authority to designate a particular condemnation procedure.

Third, and perhaps most important, both the utilities title and the eminent domain article mandate that Utility Center be paid the fair market value of its property that the City seeks to acquire as well as the damages, if any, to the residue of its property caused by taking out the part the City seeks to acquire. I.C. §§ 8-1-2-92 & 93; I.C. § 32-24-1-9.

## Conclusion

We grant transfer and affirm the judgment of the trial court with respect to its decision to grant summary judgment in favor of the City.

Rucker, J., concurs. Shepard, C.J., concurs with separate opinion. Boehm, J., dissents with separate opinion in which Dickson, J., concurs.

13

**SHEPARD, Chief Justice, concurring.**

The complicated order of events in this case and the way in which the litigants have positioned themselves makes the task of statutory interpretation more difficult than usual. There are grounds on which I anticipated that Utility Center might prevail, but those grounds turn out not to have been part of how the situation or the litigation evolved.

I see the events that unfolded during the spring of 1999 as having been both favorable to the desires of the present owners and unfavorable to them.

The Utilities Regulatory Commission had received complaints about inadequate service provided by Utility Center, Inc., since at least 1988. The tools the Commission possessed for dealing with such situations were at that time limited and somewhat traditional: a series of orders that could in theory lead to a revocation of the license. Still, the Commission was certainly engaged in deploying those tools in an effort to produce better water for consumers in Allen County. The Commission had issued multiple findings about the adequacy of service and multiple orders directed at dealing with the failures that were apparent. Utility Center, Inc., Causes No. 38686 and 38846, 1991 Ind. PUC Lexis 127, 11 (IURC 4/17/91) ("As a practical matter, then, Petitioner's treatment plant is therefore nonfunctional, as is a significant portion of its collection system."); Utility Center, Inc., Cause No. 41187, 1999 PUC LEXIS 12 (IURC 2/25/99). The owners of Utility Center had sometimes resisted these efforts. Id. At 2 n. 1.

The Commission's latest orders were in place as the General Assembly considered the amendments that became I.C. 8-1-30, or "Chapter 30." Against the backdrop of the derelictions at Utility Center, Inc., Senator Long's description of the object of Chapter 30 seems to me to complement both the statutory language itself and the situation. The Chapter 30 amendments, most particularly the authority for a Commission-directed sales or receiverships, did indeed supply the Commission with a much more useful toolbox than existed before,. This new toolbox was well suited to the chronic problems at Utility Center and doubtless useful for solving future problems in a variety of other locations. I think the Court's opinion is correct to say that no-condemnation rule for utilities subject to Chapter 30 investigations is likewise complementary. When the Commission is engaged in redirecting a troubled utility, it should be able to deploy its

various remedial powers without the intervention of an adjoining municipality, except by the Commission's permission, and it should be able to make these decisions without worrying that any subsequent condemnation might upset investment-backed expectations. I think the Court's opinion uses rather ordinary rules of statutory construction when it concludes that Chapter 30 did not effect a repeal of the general statutory authority for municipal condemnation that has been in place since the beginning of the last century (a fair contrast to the language used when the legislature changed existing law as to electric utilities).

Looking at this intertwining of regulatory and legislative activity, I would have thought that Utility Center was a utility that was the subject of the sort of processes described in Chapter 30 at the time Chapter 30 was considered and adopted by the General Assembly. Accordingly, I would also have thought that Chapter 30 constituted a barrier to the condemnation of such a utility during the course of the Commission's investigation, "unless the procedures and requirements of this chapter have been complied with and satisfied," as the sixth section of Chapter 30 provides.

The present owners of Utility Center, however, have maintained before Judge Felts, and before the courts on appeal, that Utility Center was not a utility subject to Chapter 30 procedures and requirements.

Our rules of appellate procedure, purposefully favorable to the judgments rendered at trial, provide that appellate courts can affirm a judgment even when the reasons given by the trial court seem erroneous if it appears that the right party won on other grounds that are apparent. Thornton v. Pender, 268 Ind. 540, 377 N.E.2d 613 (1978); Fort Wayne Patrolmen's Benevolent Ass'n, Inc. v. City of Fort Wayne, 408 N.E.2d 1295 (Ind. Ct. App. 1980). We do not do the opposite. That is, we do not set aside the results of a trial on the basis of an argument not made by any of the litigants but rather occurring to some appellate judge after the case has been tried. See Keller v. State, 549 N.E.2d 372 (Ind. 1990). Whether I am right that Utility Center was a "subject utility," it is not an argument presented by either party. I find myself unable to vote to reverse on such a basis.

15

**Boehm, J., dissenting**

I accept the majority's conclusion that the placement of Section 8-1-30-6 in the Indiana Code as a part of a new Chapter 30 added in 1999 suggests that it may be limited to distressed utilities.   But the language of the section is quite unequivocal:

> Sec. 6.  A municipality or other governmental unit may not require a utility company that provides water or sewer service to sell property used in the provision of such service to the municipality or governmental unit under IC 8-1-2-92, IC 8-1-2-93, or otherwise, unless the procedures and requirements of this chapter have been complied with and satisfied.

Section 2 of the new Chapter 30 defines "utility company" as a "public utility that provides water or sewer service."   I.C. § 8-1-30-2.   Section 5 of the new Chapter 30 defines "subject utility company" as one subject to a finding of violations of law or IURC orders or unremedied "severe deficiencies."   These definitions do not leave any room for interpretation.   Section 6 uses one defined term—"utility company"—and does not use the other.   The majority concludes Section 6 applies only to utilities that are subject to an order under Section 5.   But the statute has a definition—"subject utility company"—for such a company and does not use it in Section 6.

Apart from the literal language of Section 6, it seems to me that the majority reads that section in a manner that strips it of any meaning whatever.   Section 6 prohibits condemnation of a utility without going through the "procedures and requirements" of Section 5.   The majority concludes that Section 6 applies only to utilities that are the subject of a Section 5 order.   But those are the very utilities that have gone through the only "procedures and requirements" of Chapter 30.   It therefore seems to me that the majority's reading renders Section 6 wholly empty of content.

Judicial surgery is sometimes required where preposterous results are dictated by the literal language of the statute.   I do not believe Section 6 can be ignored or rewritten based on its absurdity.   If Section 6 as interpreted by the majority has any meaning at all, it must be because there could be a utility that has not gone through the "procedures and requirements" of Chapter 30, but remains subject to Section 6 as limited by the majority's reading.   One amicus curiae suggests that Section 6 applies to utilities that are under review contemplated by Section 3 but not yet subject to findings and orders under Sections 4 and 5.   There is no basis in the statute to

16

support this reading. Section 6 refers to "satisfying" and "complying with" the procedures of Chapter 30, not being "subject to review" or some similar description of a utility at an earlier stage of investigation. In any event, if there is such a thing as a utility that is subject to Section 6 as the majority limits it, but is not subject to a Section 5 order, a legislative choice to immunize all utilities from condemnation cannot be seen to be absurd. To the contrary, it seems to me that whether healthy utilities should be subject to Section 6 is a policy choice the legislature could readily make based on a desire to encourage investment in private sewer and water facilities. Indeed, the majority's reading seems less reasonable to me. Distressed utilities would seem to be the best candidates to be acquired by a governmental entity to assure stable service. On its face it is odd that the legislature would choose to prevent governmental acquisition of this perhaps imaginary class of distressed utilities but permit it as to healthy ones.

Whatever the policy considerations may be, it seems to me that this section was carefully crafted to apply to all utilities. If that is not a proper reading of Section 6, the General Assembly could easily correct it, and the City could then initiate a new eminent domain proceeding. Because I believe the Court of Appeals correctly resolved this issue, I would deny transfer. Given that transfer has been granted, I respectfully dissent.

Dickson, J., concurs.