**Cynthia M. BARRETT, Appellant–
Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 79A04–0412–CR–650.**

Court of Appeals of Indiana.

Nov. 22, 2005.

Transfer Denied Jan. 11, 2006.

Harold E. Amstutz, Lafayette, for Appellant.

Steve Carter, Attorney General of Indiana, Maureen Ann Bartolo, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Cynthia M. Barrett appeals her convictions for conspiracy to commit dealing in methamphetamine as a class B felony and two counts of illegal drug lab as class D felonies. We affirm.

### Issues

Barrett presents three issues for our review, which we restate as follows:

I. Whether the trial court abused its discretion by admitting evidence seized during a traffic stop;

II. Whether her consent to search the vehicle was valid; and

III. Whether her convictions violate her protection against double jeopardy under the Fifth Amendment to the U.S. Constitution and Article 1, Section 14 of the Indiana Constitution.

### Facts and Procedural History

On September 19, 2003, Tippecanoe County Sheriff's Department Deputy Robert Hainje responded to a call from a Meijer store loss prevention officer, who reported that two people had purchased several boxes of cold medication, a precursor for methamphetamine. The Meijer employee informed police that the individuals were driving a blue Chevrolet Geo Tracker. Deputy Hainje contacted Sergeant Terry Ruley and asked Ruley to assist him in locating the vehicle. The officers followed the Geo as it left the

Meijer parking lot and traveled onto Interstate 65.

After following the Geo for nearly four miles, Sergeant Ruley observed that it began to drift toward the shoulder and that its passenger-side tires were on the fog line for thirty to fifty yards. Based upon Sergeant Ruley's training and experience, he determined that the driver of the Geo might be impaired and initiated a traffic stop. Deputy Hainje stopped behind Sergeant Ruley and approached the driver, Joseph Kelly, to determine if he was intoxicated. As the officers approached the Geo, they observed three gallons of camp fuel located in the cargo area.

Barrett exited the passenger side of the Geo, and Sergeant Ruley questioned her about where she had been, whom she was with, and what items she had purchased. Barrett told Sergeant Ruley that she had been shopping at Meijer with Kelly, her fiancé, and that she had purchased a purse. She told Sergeant Ruley that her ex-husband owned the Geo and that there were no drugs or weapons inside. Sergeant Ruley asked to search the Geo, and Barrett consented.

Deputy Hainje talked with Kelly and determined that he did not appear intoxicated. Pursuant to standard procedure, he asked Kelly for his license and registration. Deputy Hainje found that Kelly's license was suspended and that there was an outstanding warrant for his arrest. He asked Kelly to get out of the Geo and took him into custody. Deputy Hainje requested Kelly's consent to search the Geo, and Kelly told him that the vehicle belonged to Barrett's ex-husband and that the officers should ask for her consent. Deputy Hainje told Kelly that Barrett had already consented and that he was also asking for Kelly's consent because the Geo was in Kelly's custody and control at the time of the stop. Kelly then consented to the search.

The officers searched the Geo and found a purse containing ten receipts for items purchased, including nasal decongestant, lithium batteries, a Pyrex dish, paper towels, camp fuel, and ephedrine tablets. The receipts—from Kmart, Meijer, Payless, SuperTarget and CVS—indicated that the items had been purchased within a few hours prior to the traffic stop. The receipts showed that two people had checked out at separate registers at approximately the same time in each store. Because the officers knew that the items purchased were commonly used in the manufacture of methamphetamine, they advised Barrett of her *Miranda* rights and arrested her. The officers then continued to search the Geo and found a "one hitter" pipe and a shopping list describing common precursors to methamphetamine. They also found a plastic baggy containing .03 grams of methamphetamine.

While Barrett was in custody, the officers advised her of her right to refuse consent to search her home. She signed a written consent-to-search form. She admitted to the officers that she and Kelly had purchased the items so that Kelly and her ex-husband could manufacture methamphetamine. She admitted that they had attempted to manufacture methamphetamine three or four times in the past month. She admitted that she intended to sell the drug. The search of Barrett's home turned up many items common to a methamphetamine lab, including a digital scale, canning salts, HCL generators with white sludge, coffee filters, alcohol solvents, anhydrous ammonia, and camp fuel.

On September 22, 2003, Barrett was charged with conspiracy to commit dealing in methamphetamine as a class B felony, two counts of illegal drug lab as class D felonies, and possession of methamphet-

amine as a class D felony. On September 24, 2004, following a two-day trial, a jury found Barrett guilty of conspiracy to commit dealing in methamphetamine and two counts of illegal drug lab. On November 12, 2004, the trial court sentenced her to seven years for conspiracy and eighteen months for each count of illegal drug lab, with all sentences to run concurrently. The court ordered four years suspended to probation. Barrett now appeals.

### Discussion and Decision

### I. Admissibility of Evidence

 Barrett claims that the trial court erred by admitting the evidence seized by police because the traffic stop violated her rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.[1] Our standard of review with regard to the state constitutional claim is well settled.

A trial court has broad discretion in ruling on the admissibility of evidence. Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court.

*Washington*, 784 N.E.2d at 587 (citations omitted). Article 1, Section 11 protects the citizens of Indiana against unreasonable search and seizure. In cases involving investigatory stops such as this one, the burden is on the State to demonstrate that under the totality of the circumstances, the intrusion was reasonable. *State v. Bulington*, 802 N.E.2d 435, 438 (Ind.2004). In *Bulington*, a Meijer employee alerted police that two male customers purchased several boxes of antihistamines, walked out of the store separately, and met at the same vehicle in the parking lot. Police followed the truck out of the parking lot and pulled it over in another parking lot down the road. The officers found many items commonly used in the manufacture of methamphetamine, and they arrested Bulington. There was no evidence that the police had observed a traffic violation or erratic driving while following Bulington. Thus, the stop by police was based solely on the tip that Bulington and the other man had purchased cold medicine. Our supreme court found that the tip was not enough to establish that the intrusion was reasonable for purposes of Article 1, Section 11. *Id.* at 440.

In Barrett's case, however, the officers acted upon certain facts in addition to the information that she had purchased cold medicine. At trial, Sergeant Ruley testified,

A: ... I caught up with the [Geo] as it was getting onto I–65 off the ramp. From there I followed the vehicle northbound in the right-hand lane. At approximately the one seventy-three and a half marker I observed the vehicle slowly drift off to it's [sic] right or towards the shoulder or emergency strip. Both passenger tires at that time went directly over onto the white fog line, which is the boundary of the travel portion of the

---

1. Barrett actually argues that the trial court abused its discretion by denying her "pretrial and trial motions to suppress." Appellant's Br. at 1. The issue is more accurately framed, however, as whether the trial court abused its discretion by admitting the evidence at trial. *See Washington v. State*, 784 N.E.2d 584, 586– 87 (Ind.Ct.App.2003) (trial court's denial of a motion to suppress is insufficient to preserve error for appeal; rather, defendant must make contemporaneous objection to the admission of evidence at trial). We will therefore address Barrett's argument on this basis.

roadway. Both lines were directly on top of it. It traveled approximately thirty to fifty yards on top of the fog line then it slowly drifted back over into it's [sic] lane.

Q: What did you think as a result of seeing that?

A: Based on my training and experience observing ... vehicular behavior, the pattern that it was maneuvering, I believe[d] that there was possibly an intoxicated driver.

Appellant's App. at 97–98. Sergeant Ruley also testified that while following the Geo, he observed three cues identified by the National Highway Traffic Safety Administration as initial indicators of impaired driving: (1) the Geo left the designated roadway; (2) the Geo drifted within its lane; and (3) the Geo's passenger-side tires traveled upon the lane marker line. *Id.* at 19–20. There is no contradictory evidence in the record. Therefore, we conclude that under the totality of the circumstances, the intrusion of the traffic stop was reasonable under Article 1, Section 11. The trial court did not abuse its discretion.

■■■■■ In determining whether an investigatory stop complies with the Fourth Amendment, we must determine whether the officers had "reasonable suspicion" of criminal activity when they made the stop. *Bulington,* 802 N.E.2d at 438. We are to "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). We review trial court determinations of reasonable suspicion under the Fourth Amendment *de novo* rather than

for an abuse of discretion. *Id.* at 273–74, 122 S.Ct. 744 (citation omitted).

Here, Barrett argues that Kelly did not commit any traffic infractions and that, therefore, Sergeant Ruley did not have an objective basis for stopping the Geo. Sergeant Ruley did admit that he did not witness Kelly or Barrett breaking any laws prior to pulling them over. As discussed above, however, he observed signs of impaired driving. Whether it was reasonable for Sergeant Ruley to suspect wrongdoing based upon these signs is the issue we must resolve under the Fourth Amendment standard.

Another panel of this Court addressed this issue under similar facts in *Wells v. State,* 772 N.E.2d 487 (Ind.Ct.App.2002). In that case, police received an anonymous tip of a possible drunk driver. An officer located a vehicle matching the description given by the tipster, and he followed the vehicle for approximately six blocks. During that time, the officer observed the vehicle swerving within its lane toward the fog line and the sidewalk. The vehicle was also traveling approximately ten miles per hour slower than the speed limit. The officer pulled the vehicle over, smelled alcohol as he approached the vehicle, and saw a bottle of vodka on the front passenger floor. He also discovered that there was an outstanding arrest warrant for the driver. He then took the driver into custody and administered a blood alcohol test. The driver argued that all evidence gathered during the traffic stop should be suppressed because the officer did not have a reasonable suspicion that the driver had broken, or was about to break, the law. In *Wells,* we concluded that "although an anonymous tip alone will be insufficient to establish reasonable suspicion, where significant aspects of the tip are corroborated by the observations of police, a subsequent investigatory stop is likely valid." *Id.* at

490. Although Wells had not broken any traffic laws, his driving was "in a manner consistent with that of intoxicated drivers." *Id.* That, coupled with the fact that his vehicle matched that described by the tipster, was enough for us to determine that the officer had a reasonable suspicion to stop Wells.

Here, police received a tip that two individuals, later identified as Barrett and Kelly, had purchased methamphetamine precursors at a Meijer store. When the officers responded, they observed two individuals in a vehicle that matched the description given by the Meijer security guard. They followed the vehicle and observed it being driven in a manner that indicated objective signs of driver impairment. Based on these observations, we conclude that the officers had a "particularized and objective basis" for making the traffic stop in this case. *See Arvizu,* 534 U.S. at 273, 122 S.Ct. 744. Therefore, like the trial court, we find no Fourth Amendment violation.

## II. Consent to Search

■ At trial, Barrett objected to the admission of evidence seized during the search of the Geo because, she claims, her consent to search was invalid. The trial court overruled her objection. As discussed above, decisions to admit or exclude evidence fall within the sound discretion of the trial court and are reviewed only for an abuse of discretion. *Dunlap v. State,* 761 N.E.2d 837, 841 (Ind.2002).

■ Barrett contends that she was in custody when she consented to the officers' search of the Geo. Our supreme court has held that "a person who is asked to give consent to search while in police custody is entitled to the presence and advice of counsel prior to making the decision whether to give such consent." *Pirtle v. State,* 263 Ind. 16, 29, 323 N.E.2d 634, 640 (1975). This right may be waived, but the State has the burden of showing that such waiver was explicit. *Id.* More recently, the Court stated that "a person in custody must be informed of the right to consult with counsel about the possibility of consenting to a search before a valid consent can be given." *Jones v. State,* 655 N.E.2d 49, 54 (Ind.1995) (citing *Sims v. State,* 274 Ind. 495, 498, 413 N.E.2d 556, 558 (1980)). As the Court noted in *Jones,* there is no bright-line test for determining when an investigatory stop becomes a custodial interrogation. *Id.* at 55. Generally, we ask whether a reasonable person under the same circumstances would believe that she was under arrest or not free to resist the entreaties of the police. *Id.* Here, the parties agree that the officers did not advise Barrett of her right to counsel before asking for her consent to search the Geo. The State argues, however, that Barrett was not in custody at that time, and that therefore, *Pirtle* warnings were not required.[2]

We find two cases particularly helpful to our review of this issue. In *Jones,* our supreme court found that the defendant was not in custody after police stopped him for obstructing traffic and he was asked to exit his vehicle. The Court stated,

Although the number of officers present for a traffic stop was unusually high, none of [the] officers touched Jones or physically restrained his freedom of movement before the moment he consented to a search of his car, and Jones was not asked incriminating questions. Jones was never in the care and control

---

2. After the officers searched the Geo and discovered several methamphetamine precursors, they took Barrett into custody. Police did give Barrett *Miranda* and *Pirtle* warnings after they arrested her and before they obtained her consent to search her house.

of the police or interrogated in a manner implicating the Fifth Amendment and necessitating the giving of *Miranda* warnings....

.... Had Jones refused to give the police permission to search, he would have been given two citations and been free to leave. The police had no right even "to frisk" the vehicle without Jones's consent, and they would have had no option but to cease detaining him. Thus, we conclude that at the moment Jones was asked for permission to search his car, the prosecutorial process had not yet begun against him and *Pirtle* ... rights had not attached.

*Id.* at 56. Similarly, there is no evidence that either Sergeant Ruley or Deputy Hainje physically restrained Barrett's freedom of movement before she consented to the search of the Geo. Also, it was not until later that she was interrogated in a manner requiring the officers to advise her of her *Miranda* rights.

We also addressed the issue of custody for purposes of *Pirtle* warnings in *Ackerman v. State,* 774 N.E.2d 970 (Ind.Ct.App. 2002), *trans. denied* (2003). In *Ackerman,* the police responded to a report of an accident and found a car that had left the roadway and collided with a tree. The car was damaged, and there was no driver at the scene. Police determined that the license plate was registered to a car owned by Ackerman. They found Ackerman at her home nearby. As the officers talked with her, she admitted to driving the car into the tree, and one officer noticed the smell of alcohol on her breath and that she had slow and slurred speech. An officer then asked Ackerman to return with him to the scene of the collision to complete a report. As they drove to the scene, Ack-

erman admitted that she had been drinking alcohol shortly before the accident. The officer read Ackerman her *Miranda* rights, and she waived them. The officer then administered field sobriety tests, all of which Ackerman failed. Ackerman argued that the field sobriety tests were "searches" and that the results of those tests should not be admitted because she was not given *Pirtle* warnings prior to consenting to them.[3] There, we concluded that Ackerman was in custody prior to the field sobriety tests because "a reasonable person who was transported from home with no obvious means of returning, had admitted possible illegal activity to police, and then finally was advised of her *Miranda* rights would no longer feel free to resist the entreaties of the police." *Id.* at 979.

In contrast, the vehicle in which Barrett was traveling, her ex-husband's Geo, was operational, and she presumably could have driven it from the scene of the traffic stop after denying police consent to search it. Also, before giving her consent, Barrett had not made any incriminating statements to police, and she had not been advised of her *Miranda* rights. We conclude that a reasonable person in Barrett's situation would believe that she was free to resist the entreaties of the police. Therefore, Barrett was not in custody when she gave her consent to search the Geo, and the officers were not required to advise her of her right to counsel under *Pirtle.* Barrett's consent was valid, and the trial court did not abuse its discretion by admitting the evidence seized from the Geo.

### III. Double Jeopardy

Barrett claims that her convictions on both counts of illegal drug lab

---

3. The Court determined that field sobriety tests are not "searches" for purposes of *Pirtle;* however, the Court's analysis of whether Ack-

erman was in custody for purposes of *Pirtle* is still relevant to the instant case.

should be vacated because they were in violation of her double jeopardy protections under the Fifth Amendment to the U.S. Constitution and Article 1, Section 14 of the Indiana Constitution. Indiana Appellate Rule 46(A)(8)(a) states that the appellant must support each contention with cogent reasoning and citations to legal authorities, statutes, and the record. In her brief, Barrett fails to include the requisite cogent reasoning on either her state or federal constitutional claims. We will not become a party's advocate, nor will we address arguments that are inappropriate, improperly expressed, or too poorly developed to be understood. *Lasater v. Lasater,* 809 N.E.2d 380, 389 (Ind.Ct.App.2004). Failure to put forth a cogent argument acts as a waiver of the issue on appeal. *Davenport v. State,* 734 N.E.2d 622, 623–24 (Ind.Ct.App.2000), *trans. denied.* Waiver notwithstanding, we agree with the State that the evidence presented at trial shows that the convictions did not violate Barrett's double jeopardy protections.

**** Long ago, our supreme court established the "same elements" test for federal double jeopardy claims. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Id.* at 304, 52 S.Ct. 180. Here, the illegal drug lab charges required the possession of methamphetamine precursors with the intent to manufacture methamphetamine, and the conspiracy charge required proof of the additional fact of the agreement between Barrett and Kelly to manufacture methamphetamine. There was no federal double jeopardy violation here.

**** Consideration of a double jeopardy claim under the Indiana constitution requires the application of both the *Blockburger* same elements test and the "actual evidence" test. *Goldsberry v. State,* 821 N.E.2d 447, 458–59 (Ind.Ct.App.2005). Under the latter test, we must examine the evidence presented at trial to determine whether each challenged offense was established by separate and distinct facts. *Id.* at 459. Here, the conspiracy charge was supported by the "shopping list for methamphetamine" and the ten receipts found in Barrett's purse, as well as Barrett's admission that she was purchasing items for Kelly and her ex-husband to use in the manufacture of methamphetamine. Appellant's App. at 281. One count of illegal drug lab was supported by evidence discovered in the vehicle in which Barrett was a passenger, specifically 240 ephedrine pills. The second count of illegal drug lab was supported by evidence discovered at Barrett's house, including anhydrous ammonia, camp fuel, digital scales, canning salts, drain cleaner and alcohol solvent. Barrett's multiple convictions did not violate her double jeopardy protections under the state constitution.

Affirmed.

DARDEN, J., concurs.

MATHIAS, J., dissents with opinion.

MATHIAS, Judge, dissenting.

I respectfully dissent. I believe the stop here was not reasonable under the totality of the circumstances and was in violation of Article I, Section 11 of the Constitution of Indiana, which protects those areas of life Hoosiers regard as private from unreasonable police activity. *See Brown v. State,* 653 N.E.2d 77, 79 (Ind.1995).

The majority contends that the fact that the right-side tires of Barrett's vehicle touched the fog line was an "objective sign of driver impairment" and justified the

stop of Barrett's vehicle. Op. at 1028. I disagree. The officer testified that he observed the vehicle's right-side tires travel on the fog line for thirty to fifty yards. Appellant's App. pp. 97–98. If the vehicle was traveling at 65 miles per hour, the tires touched the fog line for less than two seconds. In my view, this brief touching of the fog line, without more, was not enough to establish reasonable suspicion for purposes of Article I, Section 11.[4]

Here, while the officer testified that he believed the driver was possibly intoxicated, he also admitted that no traffic violation occurred, that there were many reasons a driver could drift onto the fog line without being intoxicated, that he did not smell alcohol when he approached the car, and that he did not administer any field sobriety tests to the driver. Although the majority distinguishes the facts of this case from those presented in *State v. Bulington*, 802 N.E.2d 435 (Ind.2004), I believe the two cases are far more alike than dissimilar. In particular, the trial court in *Bulington* specifically found that no traffic violation had occurred, thus "the police had absolutely no reason to believe defendant had violated or was violating any law when he was stopped." *Id.* at 439.

Other courts facing similar factual scenarios have concluded that a brief touching of the fog line or lane line, without more, is insufficient to provide reasonable suspicion for a stop. *See, e.g., United States v. Colin*, 314 F.3d 439, 446 (9th Cir.2002) (car's touching the right fog line and the center yellow line each for ten seconds after legitimate lane changes did not give officer reasonable suspicion of driving under the influence); *United States v. Grego-*

*ry*, 79 F.3d 973, 978 (10th Cir.1996) (where officer did not conduct a road sobriety test after stopping the defendant for briefly crossing into the right emergency shoulder lane, he did not have reasonable suspicion that the defendant was intoxicated); *United States v. Ochoa*, 4 F.Supp.2d 1007, 1012 (D.Kan.1998) (single drift onto the shoulder did not justify stopping defendant); *State v. Tague*, 676 N.W.2d 197, 205–06 (Iowa 2004) (single incident of crossing left edge line for a brief moment did not meet reasonableness test under the state constitution); *State v. Binette*, 33 S.W.3d 215, 219–20 (Tenn.2000) (occasional drifting from the center of the lane did not amount to reasonable suspicion). *See also United States v. Freeman*, 209 F.3d 464, 466–67 (6th Cir.2000) (a motor home's brief entry into the emergency lane does not constitute probable cause that the driver was intoxicated).

As the Tenth Circuit aptly observed, "[i]f failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy." *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir.1993), *overruled on other grounds by United States v. Botero-Ospina*, 71 F.3d 783, 786–87 (10th Cir. 1995). In light of the heightened privacy protection Hoosiers expect under Article I, Section 11, I do not believe that Barrett's innocuous conduct justified the initial stop. I therefore respectfully dissent.

---

4. Sergeant Ruley's testimony characterized the driver's conduct as exhibiting three cues or initial indicators of impaired driving identified by the National Highway Traffic Safety Administration. The complete list of these cues can be found at *http://www.nhtsa.*

*dot.gov/people/ injury/alcohol/dwi/ dwihtml/summary.htm* (last visited November 9, 2005). I respectfully disagree with the conclusion reached by Sergeant Ruley and the majority that the driver's observed conduct manifested three of the these cues.