**Terry BAXTER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 03A04–0710–CR–596.

Court of Appeals of Indiana.

July 30, 2008.

Jack Rogers, Rogers & Gessi, Franklin, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Terry Baxter appeals his convictions on four counts of Class D felony failure to properly dispose of a dead animal and twelve counts of Class B misdemeanor neglect of an animal. We affirm in part and reverse in part.

### Issues

The restated issues before us are:

I. whether the statutes criminalizing improper disposal of a dead animal are constitutional;

II. whether the trial court abused its discretion in allowing Bartholomew County Animal Control ("Animal Control") to participate in this case with respect to nine horses that had been seized from Baxter;

III. whether the seizure of the horses violated Baxter's rights under the Indiana Constitution; and

IV. whether there is sufficient evidence to support all of Baxter's neglect convictions.[1]

## Facts[2]

On May 25, 2006, Columbus Silgas employee Carl Hill went to 2060 North 500 West Road in Bartholomew County to pick up a propane gas tank. Baxter owned this property, on which an abandoned house was located where his mother used to live, as well as a dilapidated barn. In a muddy corral outside the barn, Hill and his co-worker saw four dead horses. The animals appeared to have been dead at least several days, judging by the flies and maggots covering them and how they lay in the mud. Hill told his supervisor what he had seen, and his supervisor contacted Animal Control.

At about 9:30 a.m. on that same day, Animal Control Officer Paul East, accompanied by Bartholomew County Deputy Sheriff T.A. Smith, went to Baxter's residence located at 8211 Georgetown Road to discuss the dead horses. While walking to Baxter's front door, Officer East and Deputy Smith saw seven living horses that appeared to be emaciated and/or parasite infected in a corral next to the house. Baxter's son answered the officers' knock on the door, and told them that the dead horses were at his deceased grandmother's house on 500 West, which is about 3/8 of a mile down the road from Baxter's house.

After Officer East and Deputy Smith saw the dead horses, Officer East decided it would be necessary to seize the still-living horses he had seen when approaching Baxter's residence. He called Shirley Smith, president of the Indiana Hooved Animal Humane Society ("the Society"), to remove the horses and place them in foster care. Workers for the Society arrived at Baxter's residence at about 1:00 p.m. to remove the horses. Acting without a warrant, the Society seized a total of nine horses from Baxter, although apparently there were several other horses on the property that they did not seize.

Shirley observed that the horses were extremely thin and lice-infested. Also, one of the seized horses had had its tail eaten off; horses sometimes eat the tails of other horses when they are malnourished. A veterinarian examined the horses on May 26, 2006. One of the seized horses, a young foal, appeared to be in "pretty good physical condition." Tr. p. 352. However, the remainder of the horses as a group "appeared to have very poor body condi-

1. Baxter also asserts trial court error in failing to permit discovery related to the seized horses and in denying his motion for the State to file a more detailed charging information. We find these arguments to not be supported by cogent reasoning and citation to relevant authority and, therefore, they are waived. *See* Ind. Appellate Rule 46(A)(8)(a); *Barrett v. State*, 837 N.E.2d 1022, 1030 (Ind.Ct.App. 2005), *trans. denied.*

2. We pause to note some deficiencies with the transcript and volume of exhibits that were filed with this court. First, there is no separately-bound table of contents for the transcript as required by Indiana Appellate Rule 28(A)(8). There is a table of contents that appears in the volume of exhibits. None of the volumes of transcript has a cover page as required by Appellate Rule 28(A)(7) and Appellate Form 28–1. Most problematic, however, is the state of the exhibits volume, which does not appear to be in any discernible order and which lacks an overall index of exhibits, as required by Appellate Rule 29(A). This has made it difficult to find highly relevant exhibits. It is unclear whether responsibility for the disorderly exhibit volume rests upon the court reporter or a party who used the volume after the reporter filed it. We urge greater care in ensuring that orderly records are presented.

tions." *Id.* at 347. On a body scale assessment that ranged from one to nine, with one being extremely thin and nine extremely overweight, the veterinarian graded the eight horses, aside from the foal, from one to four. The veterinarian considered all of the horses to be malnourished and not taken care of properly. He also believed the four dead horses had each been dead for at least a couple of days, based on the state of their decomposition. Because of the decomposition, however, the veterinarian was not able to assess the horses' body condition before death. Another veterinarian examined the same horses in August 2006 and agreed with the first veterinarian's assessment of the horses' condition when they were first seized, based on the records, but also found that they were progressing well and had improved body conditions since being removed from Baxter's care.

On June 6, 2006, the State charged Baxter with four counts of Class D felony failure to properly dispose of a dead animal, plus thirteen counts of Class B misdemeanor neglect of an animal—four counts for the dead horses and nine counts for the seized live horses. On July 10, 2006, Baxter moved for permission to sell the nine seized horses. On October 12, 2006, Animal Control moved to intervene in the case for the express purpose of objecting to Baxter's motion to sell the horses. On November 3, 2006, the trial court allowed Animal Control to intervene, and it also denied Baxter's motion to sell the horses.

On November 17, 2006, Baxter moved for the trial court to declare unconstitutional the statutes making failure to properly dispose of a dead animal a Class D felony. On December 14, 2006, Baxter filed a motion to suppress all evidence related to the warrantless viewing of the live and dead horses and seizing of the live horses on May 25, 2006. The trial court denied both motions. After a jury trial held on August 7 to 9, 2007, Baxter was acquitted of the animal neglect charge related to the foal but was convicted of the other twelve animal neglect counts, plus the four counts of failure to properly dispose of a dead animal. Baxter now appeals.

## Analysis

### I. Constitutionality of Animal Disposal Statutes

Baxter contends that the statutes criminalizing failure to properly dispose of a dead animal are unconstitutionally vague. In 2006, Indiana Code Section 15–2.1–16–20 [3] stated:

(a) A person owning or caring for any animal that has died from any cause may not allow the body to lie about. Any animal body shall be disposed of by the person within twenty-four (24) hours after knowledge of death so as not to produce a nuisance. Disposal must be by one (1) of the following methods:

(1) At an approved disposal plant.

(2) Burial upon the owner's premises to such a depth that every part of the animal's body is at least four (4) feet below the natural surface of the ground and every part of the animal's body is covered with at least four (4) feet of earth in addition to any other material that may be used as cover.

(3) Thorough and complete incineration according to standards established by an appropriate governmental agency.

(4) Composting according to standards approved by the board.

---

**3.** In 2008, this statute was recodified at Indiana Code Section 15–17–11–20. *See* P.L. 2-2008 § 8.

(b) The [State] board [of animal health] may adopt rules that allow for alternate methods of disposing of dead animals that will promote the safe, orderly, and efficient disposal of dead animals. The board may adopt rules and issue orders restricting the use of the disposal methods described in subsection (a) to control disease.

Indiana Code Section 15–2.1–21–9 [4] further provided:

(a) This section does not apply to IC 15–2.1–23 or IC 15–2.1–24.

(b) A person who knowingly or intentionally violates or fails to comply with this article commits a Class D felony.

(c) A person who knowingly or intentionally violates or fails to comply with a rule adopted under this article commits a Class A infraction.

■■■ A party challenging the constitutionality of a statute bears the burden of overcoming a presumption that the statute is constitutional. *Brown v. State*, 868 N.E.2d 464, 467 (Ind.2007). Due process principles require that a penal statute is void for vagueness if it does not clearly define its prohibitions. *Id.* A criminal statute may be void for vagueness for either of two independent reasons: (1) for failing to provide notice enabling ordinary people to understand the conduct that it prohibits, and (2) for the possibility that it authorizes or encourages arbitrary or discriminatory enforcement. *Id.* Also, a penal statute must give a person of ordinary intelligence fair notice that his or her contemplated conduct is forbidden so that no one is held criminally responsible for conduct that he or she could not reasonably understand to be proscribed. *Id.* A statute does not have to list specifically all items of prohibited

conduct; it need only inform the individual of the conduct generally proscribed. *Id.* A vagueness challenge is examined in light of the facts and circumstances of each individual case. *Id.*

Baxter does not argue on appeal that Section 15–2.1–16–20 was unclear when it advised that a person must take steps to dispose of an dead animal within twenty-four hours of learning of the death. Instead, he seems to assert that Section 15–2.1–21–9 was unclear and cannot be read as criminalizing a knowing or intentional violation of Section 15–2.1–16–20. We disagree.

The Indiana Code is arranged in an "easily understood" format by Article, Title, Chapter, and Section, in that order. *Utility Center, Inc. v. City of Ft. Wayne*, 868 N.E.2d 453, 455 (Ind.2007). "For example, Ind.Code § 1–2–3–4 stands for section 4 of chapter 3 of article 2 of title 1 of the Indiana Code." *Id.* When Section 15–2.1–21–9 said that a knowing or intentional violation of "this article" constituted a Class D felony, it clearly and unambiguously applied to statutes falling under Article 15–2.1 of the Indiana Code. That it specifically applied to Section 15–2.1–16–20 is made all the more clear by the specific exclusion of statutes falling under Chapters 15–2.1–23 and 15–2.1–24, and no other chapters, which necessarily implied that it did cover all other chapters of Article 15–2.1. In other words, Sections 15–2.1–16–20 and 15–2.1–21–9 are easily read together as making the knowing or intentional failure to properly dispose of a dead animal a Class D felony. The statutes were not unconstitutionally vague. The General Assembly clearly delineated that failure to

**4.** This statute also was recodified in 2008 and is now located at Indiana Code Section 15–17–18–9. *See* P.L. 2–2008 § 8.

properly dispose of a dead animal is a crime.[5]

## II. Animal Control's Possession of the Horses

██ In closely related arguments, Baxter contends the trial court erred in permitting Animal Control to intervene in this case and denying permission for him to sell the nine seized horses, and instead leaving them in Animal Control's and the Society's custody. There is a very specific statute, which Baxter fails to mention, governing what happens to animals that have been seized on suspicion of being abused or neglected. This statute provides in part:

(b) Any law enforcement officer or any other person having authority to impound animals who has probable cause to believe there has been a violation of this chapter or IC 15–5–12–3 may take custody of the animal involved.

(c) The owner of an animal that has been impounded under this section may prevent disposition of the animal by an animal shelter that is caring for the animal by posting, not later than ten (10) days after the animal has been impounded, a bond with the court in an amount sufficient to provide for the animal's care and keeping for at least thirty (30) days, beginning from the date the animal was impounded. The owner may renew a bond by posting a new bond, in an amount sufficient to provide for the animal's care and keeping for at least an additional thirty (30) days, not later than ten (10) days after the expiration of the period for which a previous bond was posted. If a bond expires and is not renewed, the animal shelter may determine disposition of the animal, subject to court order. If the owner of an animal impounded under this section is convict-

ed of an offense under this chapter or IC 15–5–12–3, the owner shall reimburse the animal shelter for the expense of the animal's care and keeping. If the owner has paid a bond under this subsection, the animal shelter may euthanize an animal if a veterinarian determines that an animal is suffering extreme pain.

(d) If the owner requests, the court having jurisdiction of criminal charges filed under this chapter or IC 15–5–12 shall hold a hearing to determine whether probable cause exists to believe that a violation of this chapter or IC 15–5–12 has occurred. If the court determines that probable cause does not exist, the court shall order the animal returned to its owner, and the return of any bond posted by its owner.

\* \* \* \* \*

(h) If a person is convicted of an offense under this chapter or IC 15–5–12, the court may impose the following additional penalties against the person:

(1) A requirement that the person pay the costs of caring for an animal involved in the offenses that are incurred during a period of impoundment authorized under subsection (b).

(2) An order terminating or imposing conditions on the person's right to possession, title, custody, or care of:

(A) an animal that was involved in the offense; or

(B) any other animal in the custody or care of the person.

(i) If a person's right to possession, title, custody, or care of an animal is terminated under subsection (h), the court may:

(1) award the animal to a humane society or other organization that has as

---

**5.** This is still the case under the recodified but similarly worded versions of these statutes.

its principal purpose the humane treatment of animals....

Ind.Code § 35–46–3–6.[6]

There is nothing in this statute that permits an owner of animals seized on suspicion of animal neglect or abuse to sell or otherwise dispose of the animals. In fact, under subsection (c), to prevent any kind of disposition of a seized animal by an animal shelter, the animal's owner must post a bond to cover the costs of caring for the animal. As the State points out, Baxter never posted a bond. Additionally, Baxter never requested a hearing under subsection (d) to challenge whether there was probable cause that he neglected the horses, which would have been a necessary precondition for him to regain possession of the horses. It was wholly appropriate for Animal Control to intervene in this case for the limited purpose of opposing Baxter's request to sell the animals, in clear contravention of Indiana Code Section 35–46–3–6.

Following Baxter's conviction, the trial court awarded custody of the nine seized horses to the Society, as permitted by Section 35–46–3–6(i)(1) after termination of Baxter's rights to the animals under Section 35–46–3–6(h)(2). The trial court also ordered Baxter to pay for the cost of caring for the horses during their pre-trial impoundment, which was authorized by Section 35–46–3–6(h)(1). The manner in which the horses were impounded while Baxter awaited trial and their ultimate disposition upon his convictions followed Section 35–46–3–6 to the letter.

### III. Search and Seizure

 Next, Baxter challenges the admission of evidence related to the warrantless entry onto his property by Officer East and Deputy Smith and the warrantless seizure of the nine horses by Animal Control and the Society. Although Baxter filed a motion to suppress, he proceeded to trial after denial of that motion; thus, the sole claim now is whether the trial court abused its discretion in admitting the evidence. *See Kelley v. State,* 825 N.E.2d 420, 425 (Ind.Ct.App.2005). An abuse of discretion occurs if a decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* at 427. In reviewing the trial court's ultimate ruling on admissibility, we may consider the foundational evidence from the trial as well as evidence from the motion to suppress hearing that is not in direct conflict with the trial testimony. *Id.*

 Baxter alleges only a violation of his rights under Article 1, Section 11 of the Indiana Constitution; he makes no claim under the Fourth Amendment to the United States Constitution. "The legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Litchfield v. State,* 824 N.E.2d 356, 359 (Ind.2005). Although there may be other relevant considerations under certain circumstances, generally the reasonableness of a search or seizure turns on a balancing of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs. *Id.* at 361.

This case is very similar to the one addressed by supreme court in *Trimble v. State,* 842 N.E.2d 798 (Ind.2006). There,

---

**6.** Subsection (h)(2)(B) of this statute was added in 2007, after Baxter committed these offenses but before his trial and sentencing. *See* P.L. 171–2007 § 7. Baxter fails to make any argument as to which version of the statute should apply to him.

police received a tip that a dog, "Butchie," was emaciated and in need of medical attention. An officer went to the home of Butchie's owner without a warrant to investigate the tip. The officer drove to the back of the house on a driveway regularly used by visitors. When the officer got out of his car, he walked past Butchie's doghouse, which was about thirty feet from the house and three or four feet from the driveway. When no one answered the door at the house, the officer went back to Butchie's doghouse, pulled him out of it by his chain, and saw that he was emaciated and had an injured leg. The officer called an animal control officer, who took Butchie to an animal shelter.

The State charged Butchie's owner with animal neglect. The owner moved to suppress the evidence related to the officer's observations of Butchie and his seizure. This court held that the evidence should have been suppressed. Our supreme court granted transfer, however, and held that the search and seizure was permissible under both the United States and Indiana Constitutions.

Regarding the Indiana Constitution, applying the three-part *Litchfield* test of police reasonableness, the court first concluded that the degree of police intrusion was minimal. The officer entered onto the property through generally accessible routes to investigate an "apparently credible lead." *Trimble*, 842 N.E.2d at 803. "The only item examined was Butchie himself, who was open to public view." *Id.* Furthermore, "Police are authorized to conduct routine preliminary investigations, including calling on private citizens through normal means of approach to residences or other structures." *Id.*

The court next addressed in detail the extent to which the tip that led the officer to Butchie created reasonable concern that a legal violation had occurred. It conclud-

ed that four factors supported the reliability of the tip: it was based on one of the tipster's personal observation; the officer was able to corroborate important aspects of the tip when arriving at the home; the tipsters all identified themselves to police; and there was no indication that these persons were unreliable. *Id.* at 803–04.

Finally, the court addressed the extent of law enforcement needs and stated: "the severity of the law enforcement need embraces proper concern for the health and safety of others, including animals. Where a police officer has received a timely tip concerning a possibly dangerous situation, the privacy interest is diminished." *Id.* at 804. The court concluded:

> We are not suggesting that the information available to [the officer] would justify entry into Trimble's house. But it was sufficient to trigger an investigation that was done from essentially public space, and this investigation justified further action. Once in the yard, the object of his search—an ambulatory animal in open space—is fair game; particularly when there are immediate health concerns regarding the dog. We conclude that [the officer]'s visit to Trimble's house and his subsequent actions were reasonable under the Indiana Constitution.

*Id.*

Here, Officer East and Deputy Smith went to Baxter's home on the report of a tip, phoned in by Hill's supervisor, regarding dead horses on the property that Hill had observed. Baxter makes no argument in his brief that this tip was in any way insufficient to justify Officer East and Deputy Smith's further investigation by going to his home. Baxter was not the target of arbitrary and random law enforcement activity, but of an investigation triggered by an adequate tip by a concerned citizen.

Upon arriving at Baxter's house, Officer East and Deputy Smith approached the house along a pathway regularly used by visitors to the house, as Baxter himself admitted during the motion to suppress hearing. Baxter makes much of his claim that there was a "no trespassing" sign in front of his house that the officers allegedly disregarded.[7] We believe it is illogical to think that law enforcement should be thwarted from ever approaching a house without a warrant to conduct an investigation, even along paths that any regular visitor would take, simply by the posting of a "no trespassing" sign. We decline to limit police officers in that way.

While approaching Baxter's house along the normal pathway for visitors, Officer East and Deputy Smith were able to observe living horses that appeared to be malnourished in a corral next to the house. The officers were not required to avert their eyes to avoid seeing what any visitor to the house could have seen. The degree of intrusion caused by viewing the live horses was minimal, as was the case in *Trimble.*

The viewing of the dead horses requires a slightly different analysis. To see these horses, the officers had to go to a different part of Baxter's property, away from his residence. However, they did so after being told by Baxter's son that the dead horses were there. The officers were not randomly roaming over the full extent of Baxter's property looking for evidence of a crime. We further note that Baxter evidently had given some kind of permission, explicit or implicit, for Silgas employees such as Hill to enter the property for the purpose of servicing or removing propane tanks.

Again, Baxter makes much of the fact that Officer East and Deputy Smith allegedly had to walk past a "no trespassing" sign to get to a place where they could see the dead horses. Although this case concerns the Indiana Constitution, we note that under the "open fields" doctrine of the Fourth Amendment, there is no legitimate expectation of privacy in open field areas that fall beyond a home's curtilage. *See Oliver v. U.S.*, 466 U.S. 170, 181, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984); *Blalock v. State*, 483 N.E.2d 439, 443 (Ind.1985). This is not changed by the fact that a person puts up a "no trespassing" sign by the open field. *See Oliver*, 466 U.S. at 182–183, 104 S.Ct. at 1743.

Unlike Fourth Amendment analysis, analysis of searches under the Indiana Constitution does not focus on reasonable expectations of privacy. *See Trimble*, 842 N.E.2d at 803. Still, the concept of open fields may be relevant in assessing the degree of intrusion a particular search makes on a citizen's ordinary activities, which is a consideration under the Indiana Constitution. Here, the abandoned house and accompanying dilapidated buildings on the property where the dead horses were found were at least several hundred yards away from Baxter's residence. Officer East and Deputy Smith went to the property on the basis of the tip and the confirmation by Baxter's son that the dead horses were there. Other persons besides Baxter and his family, i.e. Silgas employees, were permitted to enter the property. Officer East and Deputy Smith also did not have to enter any closed buildings or structures, or climb any fences, to see the dead horses. We find the degree of intrusion into Baxter's ordinary activities caused by the viewing of the dead horses to be infinitesimal.

Finally, we address the propriety of the seizing of the nine live horses with-

---

7. The officers denied recalling seeing any such signs.

out a warrant. The State urges us to adopt an "animal exigency" exception to needing a warrant under the Indiana Constitution. We believe our supreme court already adopted such an "exception," if it should be called that, in *Trimble*. We note the overall holding of that case, stated at the beginning of the opinion, which evidently is applicable to both the United States and Indiana Constitutions:

> We hold that a police officer receiving a credible report of a violation from an identified concerned citizen may properly enter onto private property through the normal route of access to investigate. Once there, publicly viewable evidence of a crime may properly be seized without a warrant, particularly when there is a need to act promptly to protect the health or safety of another, *whether human or animal.*

*Trimble,* 842 N.E.2d at 800 (emphasis added).

Here, acting on a tip that Baxter does not contend was unreliable, Officer East and Deputy Smith went to his home to investigate whether there were dead horses on the property. Once there, they saw not only the dead horses, which evidently had been there for some time, but they also saw horses that were still alive but appeared to the naked eye to be neglected. Given the already dead horses and the condition of the live horses, it was appropriate for law enforcement and Animal Control to move swiftly to seize the live horses for their health and safety. It was not necessary to wait for the issuance of a

warrant before doing so.[8] The seizure of the horses did require going past a fence where they were corralled; we believe that fact, however, is not enough to cause a different result from *Trimble*, especially given that horses necessarily must be placed behind a fence.

The entirety of the law enforcement and Animal Control conduct in this case was reasonable under the Indiana Constitution. The trial court did not err in denying Baxter's motion to suppress and in admitting this evidence.

### *IV. Sufficiency of the Evidence*

Finally, Baxter challenges the sufficiency of the evidence supporting all of his twelve convictions for Class B misdemeanor animal neglect.[9] When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State,* 867 N.E.2d 144, 146 (Ind.2007). "It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." *Id.* We must affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

Indiana Code Section 35–46–3–7(a) provided at the time of these offenses: "A person having a vertebrate animal in the person's custody who recklessly, knowingly, or intentionally abandons or neglects

---

8. We do acknowledge that approximately three to four hours passed between the time Officer East and Deputy Smith first saw the horses and when the Society arrived on the scene to remove them. It is conceivable a warrant could have been obtained during that time period; it might have been preferable if one had been obtained. This does not render the seizure of the horses unreasonable.

9. Except for one brief mention during his statement of the issues, Baxter does not develop an adequate sufficiency argument regarding his convictions for Class D felony failure to properly dispose of a dead animal.

the animal commits cruelty to an animal, a Class B misdemeanor." [10] The mens rea element may be proven by circumstantial evidence alone, and may be inferred from the facts and circumstances of each case. *Lykins v. State,* 726 N.E.2d 1265, 1270 (Ind.Ct.App.2000). The State is not required to prove mens rea by direct and positive evidence. *Id.* at 1271. The minimum mens rea that would support Baxter's neglect convictions is recklessness, which means acting "in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." I.C. § 35–41–2–2(c).

Here, Officer East readily observed by the naked eye that seven horses in Baxter's possession appeared to be malnourished. Shirley Smith of the Society also said that they appeared malnourished, which was confirmed in part by the fact that one of the horses had had its tail eaten by another horse. Clearly, if these two individuals could observe this, Baxter should have been able to do likewise. Most importantly, the veterinarian who examined the horses immediately after their seizure gave poor to middling estimates of their health, except for the foal, which Baxter was found not guilty of neglecting. The veterinarian also opined that the horses were not being taken care of properly. That these eight horses were not being properly cared for was further established by the fact that several months after their removal from Baxter, their health was improving considerably. Combined, this evidence is sufficient to establish that Baxter at the least was reckless with respect to the care of the horses. Baxter's request

that we consider his own testimony and that of his expert witness regarding the proper care of these horses is simply a request to reweigh the evidence, which we must decline. *See Lykins,* 726 N.E.2d at 1271.

We reach a different conclusion with respect to the four dead horses.[11] The State presented no evidence as to the cause of death of these horses. The veterinarian who first examined the nine living horses was unable to examine the dead horses sufficiently because of the state of their decomposition. The most that he could say was that they "could" have died of starvation. Tr. p. 368. Additionally, the mere fact that eight horses in Baxter's care were neglected because of malnourishment does not mean these horses were too, especially given that Animal Control did not seize all of the living horses in Baxter's care. We conclude that Baxter's convictions for neglecting the four dead horses could only be based on mere speculation and must be reversed. This does not affect his four convictions for failing to properly dispose of the dead horses.

### Conclusion

The statutes making failure to properly dispose of a dead animal a Class D felony are constitutional. Allowing Animal Control to retain possession of the nine horses while this case was pending complied with Indiana Code Section 35–46–3–6. The search of Baxter's property and the seizure of the nine horses did not violate the Indiana Constitution. Finally, there is sufficient evidence to support eight of Bax-

---

10. The statute was amended in 2007. *See* P.L. 171–2007 § 8.

11. The State argues in its brief, "The disposal statute does not require the State to prove the dead horses were treated cruelly or neglected prior to death." Appellee's Br. p. 12. That is

true, but Baxter also was convicted of neglecting these horses, not just failing to dispose of them properly. The State presents no argument on appeal that these horses were neglected.

ter's convictions for Class B misdemeanor animal neglect, but insufficient evidence to support four of those convictions. We affirm the four Class D felony convictions and eight of the Class B misdemeanor convictions and reverse four of the Class B misdemeanor convictions.[12]

Affirmed in part and reversed in part.

MAY, J., and MATHIAS, J., concur.

---

**12.** Based on the charging information, the reversed convictions would be counts 2, 6, 7, and 8.