**Glen LYKINS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 21A01–9901–CR–20.

Court of Appeals of Indiana.

April 18, 2000.

E. Thomas Kemp, Richmond, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Michael McLaughlin, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

SHARPNACK, Chief Judge

Glen Lykins appeals his convictions for three counts of neglect of a vertebrate animal, all class B misdemeanors.[1] Glen raises five issues, which we restate as:

1) whether there was sufficient evidence to support Glen's convictions for neglect of a vertebrate animal;

2) whether the trial court erred in ordering Glen to pay for labor and materials to construct structures for the maintenance of the horses and for veterinary bills while they were in the custody and care of the county;

3) whether Glen was convicted of an offense with which he was not charged;

4) whether Glen received ineffective assistance of counsel; and

5) whether the trial court's questioning of Glen regarding his finances during his sentencing resulted in a violation of his Fifth Amendment right not to incriminate himself.

We affirm.

The facts most favorable to the conviction follow. In 1997, Glen owned three horses, Cody, a nine year old paint gelding, Rusty, a four year old sorrel gelding, and Lady, a four year old bay mare. All three horses were in his care and custody. In January of 1997, Gerald Lykins, Glen's cousin, began receiving numerous phone calls from people, who mistakenly believed that he was Glen, complaining about the poor condition of the horses. Gerald told the callers that he would relay their concerns to Glen. Mac Lykins, who is Glen's uncle, also received a phone call from someone complaining about the condition of Glen's horses. The caller threatened to "turn [Glen] in" because the horses were not fed. Mac promised the caller that he would feed the horses. Both Gerald and Mac had observed that Glen's horses were very thin, did not have food, and were kept in a muddy area with no bedding. On at least one occasion, Mac and Gerald went to Glen's and provided the horses with enough hay to feed the horses for approximately ten days. Both Gerald and Mac informed Glen that they had received calls regarding the poor condition of the horses and informed Glen that they had taken the hay over to Glen's horses in response to phone calls complaining about their condition.

In January of 1997, the Fayette County Sheriff's Department also began receiving complaints that when the callers had passed by Glen's property, they observed that the horses were being neglected. In addition, Gerald had contacted the Sheriff's department about the complaints that he was receiving. In mid-January, Sergeant Jack Jones from the Sheriff's Department went to Glen's home and observed that "[t]he horses were in very bad condition" and were kept in a bare lot with no access to food. Record, p. 250. Sergeant Jones told Glen about the complaints and voiced his opinion that the horses were being neglected. Glen told Sergeant Jones that he could not locate any hay to purchase to feed the horses. Sergeant Jones, also a horse owner, told Glen that

---

1. Ind.Code § 35–46–3–7.

hay was available, but that the price was higher then average. Sergeant Jones gave Glen the name of an individual that was selling hay.

A few weeks later, Sergeant Jones received a call from an animal shelter reporting that someone had contacted it regarding the poor condition of the horses. In addition, anonymous complaints had been made to the Sheriff's Department. Sergeant Jones went to Glen's to see if Glen had acquired any hay for the horses yet. Although Glen had not yet obtained any hay, he had purchased some alfalfa cubes to feed to the horses. Glen told Sergeant Jones that he had not been able to acquire any hay and even if he did, he did not have a way to haul it. Sergeant Jones told Glen that he would haul the hay for him and also pointed out that Glen could ask one of Glen's many relatives that had trucks to pick up the hay.

Approximately two weeks later, Sergeant Jones went to Glen's again. By this time, Glen had purchased hay, but he was not feeding them enough to improve their condition. To maintain a horse in normal condition, it should be fed approximately ten pounds of grain per day and two flakes of hay, but Glen was feeding his horses only a cup of grain and two flakes of hay each per day. The horses were still in "terrible shape" and because they were kept in a bare muddy lot with feces it was likely that they had contracted many parasites in their system. Record, p. 271. Sergeant Jones told Glen that he would continue to monitor the horses. However, the investigation was taken over by Sergeant Michelle Dudley.

Then, on March 17, 1997, Vicki Turner, who had been around horses her whole life, called the Sheriff's Department and told Sergeant Dudley that she was "furious about the poor condition" of Glen's horses. Record, p. 282. She said that the horses were living in a dried up "muddy pit" and that the horses had nothing to eat and no bedding. She further described the horses as:

"very poor looking. They were looked like they had been starved. They had, I couldn't see no food. Their hips were, their bones were sticking out. Their backbones were sticking out. Their ribs were showing. Their hair was matted, it was very coarse looking. They seemed to be very lifeless. They were just very in terrible condition."

Record, pp. 272–273. Turner reported that she had checked on the horses for four of the last five days and never saw any food available for them. In addition, she purchased some hay and fed it to the horses. She did not encounter any problems in purchasing hay.

On March 18, 1997, Sergeant Jones, Sergeant Dudley, and Sheriff Harold Steel along with Dr. Warren Buhler, the state veterinarian, went to Glen's residence with a search warrant to inspect the physical condition of the horses and the premises. Dr. Buhler did a visual inspection of the horses and used a Purdue University Veterinary School scale of one to nine, with nine being an extremely fat horse and one being an extremely emaciated horse to evaluate the horses' health. He rated Glen's horses as being in category two condition, which includes horses that are very thin and emaciated. The bones of all the horses were protruding to such an extent that from a distance of fifty to one hundred feet you could "count [their] ribs." Record, p. 345. One of the horses had advanced pustule dermatitis, an infection of the skin which is caused by improper nutrition. Dr. Buhler also observed that the horses were being kept in an extremely muddy lot with muddy stalls and no place to rest. Based upon this evidence, Dr. Buhler labeled the horses as neglected. Dr. Buhler noted that Glen had an adequate amount of fair quality hay and grain to feed the horses. Dr. Buhler instructed Glen to provide the horses with a twenty-four hour continuous supply of hay to eat, to feed them grain twice a day increasing the amounts gradually, and treat the horses for any parasites that they might have.

Due to the poor condition of the horses, Dr. Buhler also told Glen that the horses should be checked by a veterinarian, and treated by a veterinarian in order to eliminate any parasites.

Later that evening, Sergeant Dudley returned to Glen's to check on whether the horses were being provided with continuous access to hay pursuant to Dr. Buhler's instructions. The feeders were empty. Sergeant Dudley checked the horses' feeders again early the next morning and found that they were still empty. During the next two days, Sergeant Dudley checked on the horses several times and found that the horses were not being fed in accordance with Dr. Buhler's instructions.

On March 20, 1997, the State charged Glen with three counts of neglect of a vertebrate animal, as class B misdemeanors. That same day, his horses were impounded and placed in the temporary care and custody of the Fayette County Animal Shelter. The jury found Glen guilty as charged. The trial court terminated Glen's rights to possession, title, custody or care of the three horses, granted a judgment against Glen for $10,936.87 to Fayette County as payment for the cost of caring for the horses, and sentenced him to thirty days incarceration on each of the three counts with the sentences to run concurrently.

### I.

■■■■ The first issue is whether there was sufficient evidence to support Glen's convictions for neglect of a vertebrate animal. When reviewing sufficiency claims, we neither judge the credibility of the witnesses nor reweigh the evidence. *Gant v. State*, 668 N.E.2d 254, 255 (Ind.1996).

Instead, we consider only the evidence which supports the conviction and all the reasonable inferences therefrom. *Perry v. State*, 638 N.E.2d 1236, 1242 (Ind.1994). We will affirm the conviction when there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt. *Brewer v. State*, 646 N.E.2d 1382, 1386 (Ind.1995). Reversal is only appropriate when reasonable persons would not be able to draw inferences as to each material element of the offense. *Smith v. State*, 660 N.E.2d 357, 358–359 (Ind.Ct.App.1996).

Glen argues that the State failed to presented sufficient evidence that he knowingly, intentionally, or recklessly neglected his horses. Glen asserts that he knew that his horses were thin and did "everything in his power to provide care for the animals." Appellant's brief, p. 10. Specifically, he asserts that when he ran out of hay, he was unable to obtain more hay to feed the horses. He also asserts that once he obtained hay, he fed the horses properly. Therefore, according to Glen, he did not have the requisite intent to commit the offenses.

■■■■ The offense of neglect of a vertebrate animal is governed by Ind.Code § 35–46–3–7. This statute provides that: "A person having a vertebrate animal in the person's custody who recklessly, knowingly, or intentionally abandons or neglects the animal commits cruelty to an animal, a Class B misdemeanor." Ind.Code § 35–46–3–7. The element of intent may be proven by circumstantial evidence alone, and it is well established that knowledge and intent may be inferred from the facts and circumstances of each case.[2] *Bigger-*

---

2. Indiana Code § 35–41–2–2 defines the different levels of culpability as follows:

"(a) A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so.
(b) A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so.

(c) A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct.
(d) Unless the statute defining the offense provides otherwise, if a kind of culpability is required for commission of an offense, it

*staff v. State*, 435 N.E.2d 621, 623 (Ind.Ct. App.1982). The State is not required to prove intent by direct and positive evidence. *Id.*

■ Here, the State provided testimony by many witnesses, including Glen's relatives, a local horse owner, the state veterinarian, and Sheriff's deputies, that during the period from January, 1997, to March, 1997, the animals were very thin and generally in poor health. The State also presented evidence that during that same period these individuals told Glen that the horses were thin and that they needed to be properly fed. In addition, Glen was told about complaints that had been made by individuals to his relatives, the Sheriff's Department, and the animal shelter. Three different people acquired hay and fed the horses themselves. None of these three people had any problems obtaining hay to feed the horses. Sergeant Jones even told Glen where he could acquire hay to feed his horses and offered to help Glen haul the hay to the horses. Therefore, while hay prices in January through March might have been higher than normal, it was available.[3] Moreover, the evidence indicates that Glen had hay in his possession for over a month when Dr. Buhler evaluated his horses. Yet at the time of Dr. Buhler's visit, the horses' bones were protruding and he concluded that the horses were being neglected. Dr. Buhler instructed Glen to provide the horses with a continuous supply of hay. Nonetheless, Glen failed to comply with the veterinarian's instructions. When Glen was arrested, his horses were still being deprived of the food necessary to a healthy condition. Clearly, from the facts set forth in this case, the jury could infer that Glen knowingly, recklessly, or intentionally, neglected the horses. *See Biggerstaff*, 435 N.E.2d at 623 (holding that evidence that five dogs in defendant's possession were kept in a filthy room covered with feces, were infected with hook worms, were emaciated, and were dehydrated due to inadequate food and water was sufficient evidence from which the trial court could have inferred that the defendant knowingly or intentionally neglected the dogs); *Reynolds v. State*, 569 N.E.2d 680, 682 (Ind.Ct.App.1991) (holding that the jury could infer that the defendant neglected her animals where evidence was presented that the animals were kept in an inhumanely hot environment, were thin, were not provided with a proper place to excrete waste, were not provided with food or water, were not inoculated, were kept in cages that were too small, and the animals were frightened of humans).

Glen's assertion that he did not have the requisite intent to neglect his horses because he was unable to obtain hay to feed his horses is merely an invitation for this court to engage in reweighing of evidence, which we cannot do. *See Gant*, 668 N.E.2d at 255. We conclude, based upon the above facts, that a reasonable trier of fact could infer Glen's guilt beyond a reasonable doubt. *Brewer*, 646 N.E.2d at 1386. Therefore, the evidence was sufficient to support his conviction.

## II.

The second issue is whether the trial court erred in ordering Glen to pay for labor and materials to construct structures for the maintenance of the horses and for veterinary bills while they were in the custody and care of the county. When a person is convicted of neglect of a vertebrate animal, Ind.Code § 35–46–3–6(h) specifically authorizes the trial court's imposition of an additional penalty that "require[s] that the person pay the costs of caring for an animal involved in the offenses that are incurred during a period of

---

is required with respect to every material element of the prohibited conduct." Ind.Code § 35–41–2–2.

3. Even assuming arguendo that Glen could not find hay, the horses were also not being fed enough grain. Glen does not claim that grain was not available.

impoundment ..." Ind.Code § 35–46–3–6(h).

■ Here, the trial court ordered Glen to pay for the costs incurred by Fayette County in constructing stables to house Glen's three horses while they were impounded. The stables were built solely because the trial court had previously ordered the Fayette County Animal Shelter to house Glen's three horses. Pursuant to I.C. § 35–46–3–6(h), the trial court was authorized to require that Glen pay for the costs of providing shelter for the horses while they were impounded because shelter is a necessary part of caring for the horses. *See* I.C. § 35–46–3–6(h).

■ The trial court also ordered Glen to pay for costs incurred by the county for veterinary treatment of one of his horses while it was housed at the animal shelter. The horse was injured after it ran into a fence during a lightning storm. The resulting injury to the horse necessitated that the horse be treated by a veterinarian. Regardless of where the horse was housed when this injury occurred, the costs associated with treating it for injuries were necessary to properly care for the horse. *See* I.C. § 35–46–3–6(h).

Glen argues that the statute should only cover reasonable expenses, and that $10,-936.87 in costs for labor and materials to build structures to shelter the horses and for the veterinary bill is unreasonable. However, Glen fails to set forth any specific amounts in relation to building the structures that he claims were unreasonable and does not tell us why he claims the veterinary bill is unreasonable.[4] Moreover, it is implicit in the trial court's order

of $10,936.87, a lesser amount than the $12,226.96 originally requested, that it considered the charges for the care of Glen's horses and decided that $10,936.87 was a reasonable amount.[5] Because the costs incurred by Fayette County to house the horses and for the veterinary bill were for caring for Glen's horses and he does not tell us how they were unreasonable, we conclude that the trial court did not err in ordering Glen to pay the costs. *See* I.C. § 35–46–3–6(h).

### III.

■ The next issue is whether Glen was convicted of an offense with which he was not charged. Glen argues that he was convicted for cruelty to animals, a crime for which he claims that he was never charged. He asserts that the crime of cruelty to animals is covered exclusively by Ind.Code § 35–46–3–12.[6] That statute sets forth cruelty to animals as a class A misdemeanor. Glen was charged with and convicted under Ind.Code § 35–46–3–7, which sets forth the crime of cruelty to an animal as a class B misdemeanor.

■ "The purpose of an information is to advise the defendant of the particular crime charged so that he can prepare a defense." *Cash v. State*, 557 N.E.2d 1023, 1025 (Ind.1990), *reh'g denied*. "Absence of detail in an information is fatal only if the phraseology misleads the defendant or fails to give him notice of the charges against him." *Id.* The Indiana Constitution entitles a criminal defendant to be advised of "the nature and cause of the accusation against him, and to have a copy thereof." Ind. Const. Art. 1 § 13; *Kelly v. State*, 535 N.E.2d 140, 141 (Ind.1989).

---

4. Glen merely states that it is unreasonable for him "to pay for capital improvements at the shelter and for injuries a horse received through no fault of [his]." Appellant's brief, p. 14.

5. The trial court denied Fayette County's request to the extent that it included reimbursement for additional fencing installed at the shelter while the horses were kept there.

6. Ind.Code § 35–46–3–12(a) provides:

"A person who knowingly or intentionally tortures, beats, or mutilates a vertebrate animal *commits cruelty to an animal, a Class A misdemeanor*. However, the offense is a Class D felony if the person has a previous, unrelated conviction under this section."

I.C. § 35–46–3–12 (emphasis added).

Moreover, Ind.Code § 35–34–1–2(a)(2) requires that "[t]he indictment or information shall be in writing and allege the commission of an offense by: . . . (2) stating the name of the offense in the words of the statute or any other words conveying the same meaning . . ." Ind.Code § 35–34–1–2(a)(2).

In the instant case, each information reads exactly the same except with regard to the description identifying each specific horse. For example, the information for count 1 provides in relevant part:

> "DEFENDANT, on or about March 18, 1997 at 1431 W. Columbia Rd. in the County of Fayette in the State of Indiana, was a person having custody of a vertebrate animal, to wit: 9 year old Paint Horse, and defendant knowingly or intentionally neglected said animal, all of which is contrary to the form of the statute in such cases made and provided, to wit: Indiana Code 35–46–3–7, and against the peace and dignity of the state of Indiana."

Record, p. 6, *see also* Record, pp. 7–8. Indiana Code § 35–46–3–7, the statute under which Glen was charged, provides: "A person having a vertebrate animal in the person's custody who recklessly, knowingly, or intentionally abandons or neglects the animal *commits cruelty to an animal, a Class B misdemeanor.*" I.C. § 35–46–3–7 (emphasis added). In entering the judgment of conviction, the trial court found Glen guilty on all three counts of "neglect of a vertebrate animal or guilty of cruelty to an animal, a class B misdemeanor." Record, p. 571. Glen's written judgment of conviction stated in relevant part: "the Defendant, Glen Lykins . . . is guilty of three (3) counts of Cruelty To An Animal, a Class B Misdemeanor." Record, p. 104.

■ Glen seems to take issue with the trial court's omission of the phrase "cruelty to an animal" (as stated at the end of the statute) in the charging information and the trial court's failure to state that he was convicted of neglect of a vertebrate animal (from the statute) in its *written* sentencing or judgment of conviction. The language in each information explicitly states that Glen was being charged under I.C. § 35–46–3–7, that Glen was in custody of each specific vertebrate animal, and that he knowingly or intentionally neglected that animal in contravention of I.C. § 35–46–3–7. As such, the purpose of the information, to advise Glen of the particular crime charged so that he could prepare a defense, was met here. *See Cash*, 557 N.E.2d at 1025. Therefore, any absence of detail here was not fatal to the information. *See id.* Under the statute if an individual knowingly, intentionally, or recklessly, neglects a vertebrate animal, then the individual commits cruelty to an animal as a class B misdemeanor. *See* I.C. § 35–46–3–7. As the statute prescribes, those actions result in cruelty to an animal as a class B misdemeanor. That is the crime for which Glen was convicted. Consequently, Glen's claim that he was improperly convicted of cruelty to animals as a class A misdemeanor must fail.

## IV.

■ The next issue is whether Glen received ineffective assistance of counsel. In reviewing a claim for ineffective assistance of counsel, we apply a two step analysis. *Brown v. State*, 691 N.E.2d 438, 445 (Ind.1998). First, in light of all the circumstances, the defendant must show that the acts or omissions of counsel were outside the wide range of professionally competent assistance. *Id.* at 446. To meet the first prong the defendant must show that the counsel's performance was unreasonable under the prevailing professional norms. *Id.* "Isolated poor strategy, bad tactics, a mistake, carelessness or inexperience do not necessarily amount to ineffective assistance of counsel unless, taken as a whole, the defense was inadequate." *Brown v. State*, 698 N.E.2d 1132, 1139 (Ind.1998), *reh'g denied, cert. denied,* —— U.S. ——, 119 S.Ct. 1367, 143 L.Ed.2d 527 (1999).

Second, the defendant must show that he was prejudiced by the deficient performance. *Brown,* 691 N.E.2d at 446. To establish prejudice a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and, in this context, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Smith v. State,* 689 N.E.2d 1238, 1244 (Ind.1997) (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984), *reh'g denied* ). Our supreme court has pointed out that "recently the Supreme Court of the United States held that prejudice resulting from ineffective assistance is not established unless the error rendered the result of the proceeding fundamentally unfair or unreliable." *Dowdell v. State,* 720 N.E.2d 1146, 1150 (Ind.1999) (citing *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993)).

▬ "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland,* 466 U.S at 697, 104 S.Ct. at 2069; *see also Childers v. State,* 719 N.E.2d 1227, 1231 (Ind.1999). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069.

Glen offers numerous instances of alleged deficient performance by his attorney. Glen asserts that his counsel was ineffective because he was not adequately prepared for trial and failed to seek a continuance,[7] failed to object to inadmissible evidence, failed to follow basic rules of procedure at trial, and failed to properly prepare for sentencing. He asserts that the compilation of these errors rendered the verdict unreliable and prejudiced him.

▬ We first look to whether Glen was prejudiced by these alleged errors. With regard to Glen's claim that his counsel was ineffective because he did not properly prepare for trial, he claims that he was harmed in the following ways:

> "[his trial attorney] appeared to have no clear purpose in questioning his witnesses. He engaged in lengthy cross-examinations of each of the State's witnesses that meandered almost without purpose and did little more than repeat the State's evidence against Mr. Lykins. His lines of questions often needed to be reigned [sic] in by the trial court as having no purpose. Trial counsel's failure to attempt to obtain a continuance of the trial to prepare his case constituted ineffective assistance of counsel resulting in direct prejudice to Mr. Lykins."

Appellant's brief, pp. 18–19 (citations omitted). Glen's bald assertion that the above alleged errors prejudiced him must fail because he does not inform us of how the result of his trial would have been different if his attorney had not made the alleged errors. *See Smith,* 689 N.E.2d at 1244.

▬ Next, Glen asserts that his counsel was ineffective for failing to object to the admission of inadmissible evidence. He states that hearsay testimony regarding the anonymous phone calls made to his relatives was improperly admitted. He asserts that testimony given by Sergeants Jones and Dudley in a narrative manner regarding the complaints each had received about the condition of the horses left the impression with "the jury that the neglect of the horses was obvious" and that "[t]his impression was formed without [him] having the opportunity to cross-examine these complainants regarding their knowledge of the horses, motives or other basis for their claims against Mr. Lykins. This prejudiced the jury's view of the evi-

---

7. Glen asserts that Richard Smith, his trial attorney, began representing him within twenty-one days or less of his trial.

dence in the case and hence, harmed Mr. Lykins." Appellant's brief, p. 20. However, pictures were presented to the jury upon which they could determine the horses' condition. They did not have to rely upon the complaints by anonymous individuals to form their opinion. Therefore, Glen has not demonstrated prejudice because he has not presented evidence that, but for these alleged errors, the result of his trial would have been different *See Smith*, 689 N.E.2d at 1244.

■ Glen next asserts that his counsel was ineffective for failing to object to the comments made by a deputy on a videotape that was played during trial. He asserts that the jury should have been allowed to determine what the video represented without hearing comments from the deputy including " 'the feeder is empty' " and that the situation was simply " 'pitiful.' " Appellant's brief, p. 20. Glen admits that the video showed an empty feeder, therefore, the comments by the deputy only restated what the jury could already see for themselves. He claims that the opinion voiced by the deputy that the condition of the horses was "pitiful" was prejudicial to him because the condition of the horses was the main physical evidence of the case. However, the terrible condition of the horses was depicted by video and pictures. One comment that they looked "pitiful" is hardly enough to say that, but for his comment, the jury verdict would have been different. *See Smith*, 689 N.E.2d at 1244.

Glen also contends that his counsel was ineffective for failing to follow basic procedures at trial such as failing to gain a ruling of admission on the check that Glen used to pay for the hay that he had purchased and for attempting to cross examine a State's witness during the showing of a videotape. He does not allege that he was prejudiced by these errors, if any, nor do we find any evidence thereof.

Finally, Glen argues that his counsel was ineffective because he failed to prepare for the sentencing portion of the trial.

He asserts that his counsel did not anticipate that the trial court might terminate Glen's ownership of his horses. Moreover, Glen asserts that his trial counsel stated that he had never read the report of the Dr. Buhler which had been filed almost one year before the sentencing hearing that recommended that Glen's ownership be terminated. Glen argues that the prejudice here is clear because "the trial court specifically stated that it relied on Dr. Behler's [sic] report in reaching its decision to terminate [Glen's] ownership of the horses." Appellant's brief, p. 22. Glen contends, at a minimum, that his attorney should have called Dr. Buhler for questioning at the sentencing hearing. However, even if Glen's trial attorney would have called Dr. Buhler, he does not tell us what testimony that he would have given that would have helped his case.

Glen has merely made bare contentions that he was harmed and prejudiced here, without telling us how. Glen has not established that he was prejudiced by the alleged errors or by a compilation of those alleged errors because he has not demonstrated that there was a reasonable probability that, but for the alleged errors by his trial counsel, the result of the proceeding would have been different. *See Smith*, 689 N.E.2d at 1244. Moreover, the State presented independent overwhelming evidence that Glen intentionally, knowingly, or recklessly neglected his horses. *See supra* part I. Because Glen has not demonstrated how he was prejudiced by the alleged errors by his attorney, we need not look to whether his counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. Finally, we cannot say that the errors alleged by Glen rendered the result of his trial fundamentally unfair or unreliable. *See Dowdell*, 720 N.E.2d at 1150.

V.

The final issue is whether the trial court's questioning of Glen regarding his

finances during the sentencing hearing resulted in a violation of his Fifth Amendment right not to incriminate himself. Glen argues that before the trial court placed him under oath and questioned him about his finances, it should have advised him of his Fifth Amendment right to refuse to become a witness against himself.

■ Indiana courts have not addressed this issue. However, the United States Supreme Court has stated that "[t]he Fifth Amendment by its terms prevents a person from being 'compelled in any criminal case to be a witness against himself.'" *Mitchell v. United States*, 526 U.S. 314, 327, 119 S.Ct. 1307, 1314, 143 L.Ed.2d 424 (1999) (quoting U.S. CONST. AMEND. V). In addition, the Supreme Court has held that, in a criminal case, the Fifth Amendment privilege must be accorded the same protection in the sentencing phase as that which is due in the trial phase of the same case. *Mitchell*, 526 U.S. at 328–329, 119 S.Ct. at 1315 (1999).

■ Here, when Glen was questioned by the trial court regarding his finances, he did not assert his Fifth Amendment right to remain silent. Therefore, by choosing to answer the questions without objection he has waived his Fifth Amendment privilege to remain silent. *Cf. Powell v. Texas*, 492 U.S. 680, 684, 109 S.Ct. 3146, 3149, 106 L.Ed.2d 551 (1989) (stating that the Fifth Amendment privilege is waived if a defendant takes the stand). Moreover, Glen's attorney did not object to the trial court's questioning of him. *See Locke v. State*, 461 N.E.2d 1090, 1093 (Ind.1984) (holding that a defendant's failure to object waived any claim of error on appeal). Even assuming arguendo that Glen did not waive his right for failure to object, he has not cited and our research has not revealed any authority to support his proposition that the trial court had an affirmative right to inform him of his Fifth Amendment right to remain silent before questioning him about his finances during his sentencing hearing. Therefore, Glen's claim must fail.

For the foregoing reasons we affirm the judgment of the trial court.

Affirmed.

RILEY, J., and KIRSCH, J. concur.