**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MICHAEL A. SLAGLE**
Slagle Law Office
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LEE ROSS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 61A01-1207-CR-306 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PARKE CIRCUIT COURT
The Honorable Sam A. Swaim, Judge
Cause No. 61C01-1109-CM-300

**February 13, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Lee Ross appeals her convictions for cruelty to an animal as class A misdemeanors.[1] Ross raises one issue which is whether the evidence is sufficient to sustain her convictions. We affirm.

The facts most favorable to the convictions follow. On a very hot day, September 1, 2011, John Thomas was at his home in Rosedale, Indiana.[2] At approximately 1 p.m. he heard a disturbance outside, and he looked outside and observed that his son's girlfriend, Tiara Chaney, was trapped in her vehicle on his driveway by three "[p]retty big" dogs which Thomas knew belonged to Ross.[3] Transcript at 5. The dogs began to fight with each other and then ran towards Ross's home, and Chaney was able to enter Thomas's home.

Soon after, Jayleen Strole was walking in the same area when the same three dogs ran towards her, circled her, and bit her ankles and toes. The dogs began to jump on her and attempted to knock her down, and she "looked down and the one Pit Bull that was over here just reached in and grabbed a hunk out of [her] leg, looked up at [her] and had blood all over its mouth and [her] meat and was chewing it and swallowed it in front of [her]." Id. at 19. Jimmy Baynum, a tree service worker, observed the dogs attacking Strole and "ripping at her savagely," and he drove towards her in his truck and attempted to scare them off by honking his horn. Id. at 39. When that failed to work, Baynum

---

[1] Ind. Code § 35-46-3-7 (Supp. 2009).

[2] The State introduced climatological data indicating that the high temperature in the area on that day 2011 was ninety-seven degrees. Officer John Holcomb testified that the heat index "was well over 100." Transcript at 51.

[3] James Combs, a veterinarian with the Indiana State Board of Animal Health who examined the dogs, testified that one dog was a "Coonhound type dog and the other two were Bull Terrier dogs or mixes of that." Transcript at 59. Ross testified that the Coonhound was the mother of the other two dogs.

2

exited the vehicle and attacked the dogs with his hands and feet and was able to free Strole from the dogs. Baynum called 911 and attempted to calm Strole down. He retrieved a first aid kit from his truck, and while he was administering Strole first aid, Thomas fired a gunshot because he observed one of the dogs approaching Baynum from behind. The dogs then ran back behind Ross's fence.

Deputy Steven Runyan of the Parke County Sheriff's Office arrived on the scene and observed Strole being treated by first responders. Deputy Runyan spoke with Baynum, located the dogs inside the fenced area of Ross's residence and noted that they were aggressive, observed an opening in the fence, and slid a piece of wood across the opening to contain the dogs. Deputy Runyan also contacted the local school and advised the school to hold the students until the dogs could be secured. Also, Officer John Holcomb, a part time animal-control officer, arrived around 2:30, and when he and Deputy Runyan entered the fenced area the dogs charged at him "very aggressively." Id. at 49. Officer Holcomb donned a bite suit, and, using a six-foot snare, attempted to capture the dogs. Deputy Runyan observed a broken window with broken glass on the south side of the home which he determined was the only way the dogs could have exited. Deputy Runyan did not hear or observe any air conditioning or fans running in the home.

Officer Holcomb did not have a problem capturing one of the dogs, but "[t]he other two were very, very aggressive. I'm talking red zone," or "over the top" to the point that "you can't handle them" and they were "very dangerous." Id. at 50. The dogs were biting at his snare pole, bleeding at the mouth, and trying to attack him. After

3

capturing the second dog, Officer Holcomb rested for a while due to the heat which, with the heat index, "was well over 100." Id. at 51. Also, Deputy Runyan rotated with Officer Kent Hutchins between watching the yard and taking cover under the shade of a tree to keep cool. Officer Holcomb was eventually able to capture all three dogs.

On September 9, 2011, the State charged Ross with three counts of cruelty to an animal as class A misdemeanors. On June 6, 2012, the court held a bench trial at which evidence consistent with the foregoing was presented. Thomas testified that he had not observed Ross at her home for at least a week or two leading up to the September 1, 2011 incident, that he believed she was not often present at the home, and that he had not observed the dogs for two or three weeks leading up to the incident. Thomas also testified that he was not working during this time period and was home "quite a bit." Id. at 9. Strole testified that she had lived in the area for approximately six years and that she had previously observed one of the dogs but not the other two.

Baynum testified that he went back to the scene on the morning of September 2, 2011, because he had been asked to file a report and he wanted to better understand the facts including the names of the persons involved and the streets, and while at the scene he observed Ross and a male, later identified as Dave Conder, sitting in a vehicle and he approached the vehicle. Baynum testified that Ross and Conder indicated that they had "stayed the night out in their car" because "they were afraid to go inside." Id. at 38. Baynum also testified that Ross indicated that "she had no idea, that she had been out of town over in Indianapolis for the past week and that they'd just gotten back and was afraid to go inside," and she apologized to Baynum. Id. at 40. Baynum testified that it

4

struck him as "odd that they were in the vehicle all night and the windows were fogged up." Id. at 41.

Officer Holcomb testified that, in his experience, heat can be very stressful on a dog, that dogs have to have water and ventilation, and that "[i]f they don't have that – that's what causes a lot of these dogs to go in the red zone . . . . Any time after 90 degrees they really get stressed out." Id. at 52. James Combs of the Indiana State Board of Animal Health testified that heat can be a stressor on a dog, that safe levels are "between 45 and 85 degrees," and that "[b]eyond those extremes then you can see difficulties . . . ." Id. at 61. Combs testified that extreme heat conditions occur in "an enclosed situation with no ventilation . . . ." Id. at 66.

Deputy Randall Kneeland of the Parke County Sheriff's Office testified that he was familiar with Ross and the dogs, that the biting incident happened in his front yard, that he made contact with Ross four days after the incident and she told him she had been visiting late at night on a daily basis to feed and water the dogs, and that he has observed Ross keeping the dogs in her van while it was running in the wintertime to keep them warmer and in the "[s]ummertime I guess to keep them cool. I'm not sure." Id. at 92. Deputy Kneeland testified that it had been "some time" since he had witnessed Ross putting the dogs in the van "because I hadn't even seen Ms. Ross around either." Id. at 93. Deputy Kneeland indicated that, four days after the incident no one, including Ross, had phoned the Parke County Jail to inquire about the dogs. Ross testified that the dogs previously belonged to her mother, who passed away about one year before the date of

the trial. Ross also testified that that she would place a tarp on the floor for the dogs to use to urinate and defecate.

The court found Ross guilty as charged, stating that she recklessly neglected the dogs and abandoned them and that it did not find her testimony nor the testimony of her friend Dave Conder to be credible. On July 3, 2012, the court held a sentencing hearing and sentenced Ross to one year suspended to probation on each count and ordered that the sentences be served concurrently.

The sole issue is whether the evidence is sufficient to sustain her convictions for cruelty to an animal as class A misdemeanors. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess witness credibility or reweigh the evidence. Id. We consider conflicting evidence most favorably to the trial court's ruling. Id. We affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." Id. (quoting Jenkins v. State, 726 N.E.2d 268, 270 (Ind. 2000)). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. Id. at 147. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. Id. A conviction may be based upon circumstantial evidence alone. Fought v. State. 898 N.E.2d 447, 450 (Ind. Ct. App. 2008). Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. Id.

The offense of cruelty to an animal is governed by Ind. Code § 35-46-3-7 which provides in relevant part that "(a) A person who: (1) has a vertebrate animal in the person's custody; and (2) recklessly, knowingly, or intentionally abandons or neglects the animal; commits cruelty to an animal, a Class A misdemeanor." "Neglect" means in part to "(A) endanger[] an animal's health by failing to provide or to arrange to provide the animal with food or drink, if the animal is dependent upon the person" for such or "(C) restraining an animal in a manner that seriously endangers the animal's life or health." Ind. Code § 35-46-3-0.5(4). "Abandon" means in part to desert an animal or to leave the animal permanently in a place without making provision for adequate long term care of the animal. Ind. Code § 35-46-3-0.5(1). Also, the State at a minimum was required to prove that Ross engaged in the conduct "recklessly," which the Indiana Code defines as engaging "in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." Ind. Code § 35-41-2-2(c).

Ross begins her argument by discussing the definition of "abandon" and emphasizes that the definition requires the State to prove that the defendant left the animal "**permanently** in a place without making provision for adequate long term care," and that the State did not prove permanent desertion of the dogs by Ross. Appellant's Brief at 12. Regarding neglect, Ross argues that the State failed to prove neglect beyond a reasonable doubt and points to a statement made by the court while rendering its determination of guilt that "I mean look at the situation inside the home and particularly concerning – well let me back up a second. **It would have been nice to have known**

7

**what the inside of the home was like when this happened, but we don't know that**." Id. at 15 (quoting Transcript at 212). Ross argues that, based on this statement, the court's determinations regarding the heat of the home, the lack of ventilation, the lack of running water, and feces in the home were speculative in nature. Ross argues that testimony by her friend David Conder, as well as her own testimony, established that there were fans in the home for the purpose of circulating air and that they had been stopping by the home at night to provide the dogs food and water. Ross argues that Strole, Baynum, Officer Holcomb, Deputy Runyan, and Combs all indicated during their testimony that the dogs appeared to be healthy and not malnourished, and Combs also noted that the dogs were current on their vaccinations.

The State argues that Ross was absent from the home "for at least several critical days," noting in particular that Ross "admitted to Baynum that she had been away from her home and in Indianapolis for a week." Appellee's Brief at 8. The State argues that Ross "testified that she often had to lay out a tarp or paper for the dogs to urinate and defecate, because she did not let them out regularly." Id. at 9. The State argues that on the date of the attack "the actual temperature was in the upper 90 degrees and the heat index was over 100 degrees," that Ross "restrained her animals in her house," that "[n]o windows were open other than the window that the dogs had broken to escape," that "[n]either the air conditioner nor fans were operating in the house," and that "[n]o water or food for the animals was present." Id. The State argues that Combs, a veterinarian, testified that "exposing a dog to temperatures of mid-90 degrees to low 100 degrees would be detrimental to its health" and that "a dog kept in temperatures of over 100

8

degrees with no ventilation would 'go down fairly quickly.'" Id. (quoting Transcript at 65). The State argues that extreme heat "terribly stresses" dogs and can cause them to "go into the 'red zone,'" that "[a]t least two of the three dogs were in the 'red zone,'" and that Combs testified "that dogs would attempt to alleviate the condition causing stress." Id. at 10. The State also argues that Ross abandoned her dogs, as evidenced by her admission that she placed a tarp and paper inside for urinating and defecating and that she had been absent for a week. The State asserts that Ross's arguments are invitations that we reweigh the evidence. Ross argues in her reply brief that certain arguments by the State regarding the conditions inside the home were based upon Deputy Runyan's testimony of his observations outside of the residence and that he never entered the residence.

Initially, to the extent that Ross argues that the State failed to prove intent, we observe that "[t]he mens rea element may be proven by circumstantial evidence alone, and may be inferred from the facts and circumstances of each case." Baxter v. State, 891 N.E.2d 110, 121 (Ind. Ct. App. 2008) (citing Lykins v. State, 726 N.E.2d 1265, 1270 (Ind. Ct. App. 2000)). "The State is not required to prove mens rea by direct and positive evidence." Id.

As noted above, the court found that Ross recklessly neglected her dogs. The facts most favorable to her convictions reveal that on September 1, 2011, a day in which the temperature reached the upper nineties and the heat index was well over 100 degrees, Ross's three dogs exited her home by breaking through a window and then left the premises through a hole in her fence. The dogs "savagely" attacked Strole, and one of

9

the dogs bit "a hunk" from Strole's leg, chewed it, and swallowed it. Transcript at 19, 39. Officer Holcomb, an animal-control officer, noted that the dogs were very aggressive and that two of them were in the "red zone" to the point that "you can't handle them," and they were "very dangerous." Id. at 50. Prior to the incident, Ross had not been seen at her home by her neighbors for days or weeks, and Ross admitted to Baynum that she had been "in Indianapolis for the past week and that they'd just gotten back and [were] afraid to go inside." Id. at 40. In the past, Ross had used her van to cool or warm the dogs, but she had not been seen doing this by Deputy Kneeland, her neighbor, for "some time" because he had not seen Ross in the neighborhood. Id. at 93. Deputy Runyan testified that while at Ross's home he did not hear or observe any air conditioning or fans running in the home. The following morning, Baynum observed Ross and a male sitting in a vehicle in her driveway, and Ross explained that she had slept in the vehicle and that she was afraid to enter the home.

Ross's arguments on appeal are an invitation to reweigh the evidence, which we cannot do. See Drane, 867 N.E.2d at 146. Based upon the record in this case, we conclude that the State presented evidence of probative value from which a reasonable trier of fact could have found that Ross restrained her dogs in a manner that seriously endangered their lives or health beyond a reasonable doubt.[4]

Based upon the foregoing, we affirm Ross's convictions for cruelty to an animal as class A misdemeanors.

Affirmed.

---

[4] Because we find that the State proved that Ross recklessly neglected the dogs, we need not analyze whether she abandoned her dogs under Ind. Code § 35-46-3-0.5(1).

BAILEY, J., and VAIDIK, J., concur.