**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**ADAM G. FORREST**
Boston Bever Klinge Cross & Chidester
Richmond, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| AMY R. HOCKETT, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 89A05-1304-CR-174 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE WAYNE SUPERIOR COURT
The Honorable Gregory A. Horn, Judge
Cause No. 89D02-1202-MR-1

**February 10, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Amy R. Hockett ("Hockett") was convicted after a jury trial of murder[1] and sentenced to sixty years executed. She appeals, raising the following restated issues for our review:

I.      Whether the trial court committed fundamental error by permitting an amendment to the charging information after the omnibus date;

II.     Whether sufficient evidence was presented to support her conviction for murder; and

III.    Whether her sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## FACTS AND PROCEDURAL HISTORY

K.H. was born on October 11, 2011 to Hockett, who was twenty-one at the time, and her boyfriend, Joseph Pierson ("Pierson"), who was twenty-four at the time. K.H. was the fourth child of Hockett and Pierson, with prior children being born in February 2008, April 2009, and July 2010. Prior to K.H.'s birth, Hockett had sought a tubal ligation from her obstetrician, but was unable to receive one because her Medicaid insurance would not cover the procedure until she turned twenty-one. When she became pregnant with K.H., she was "concerned" and "shocked" with the unplanned pregnancy. *Tr.* at 867. At the time she delivered K.H., her obstetrician performed a tubal ligation.

At the time of his birth, K.H. was full-term, normal, and apparently healthy. His birth weight was 8 pounds, 7.3 ounces, which put him in the seventieth percentile. K.H. was released from the hospital, weighing 7 pounds, thirteen ounces. Hockett returned a

---

[1] *See* Ind. Code § 35-42-1-1.

week later to the Reid Pediatric and Internal Medicine Center ("the Pediatric Center") with K.H. for a well-child visit. At that appointment, K.H.'s weight had dropped two ounces below his weight at discharge, but Hockett reported K.H. was having regular bowel movements and at least nine wet diapers a day. *Id*. at 643-44. Hockett did not voice any concerns about K.H.'s health. She was told to call the physician if K.H. experienced fever, vomiting, or diarrhea. Another well-child visit was scheduled for the following week, but K.H. was not brought back and records showed that there was no attempt by Hockett or Pierson to reschedule. K.H. should have had additional appointments at two weeks, one month, two months, and four months of age, but was never brought back to the Pediatric Center.

Hockett, Pierson, and their four children, including K.H., lived in a "very, very small" two bedroom house in Richmond, Indiana. *Id*. at 875. The house was described as dim, filthy, and messy, with trash overflowing, clothing and dog feces on the floors, piles of dishes with dried food, and feces smeared on the walls and windows. The house also had a strong odor of urine and feces.

At 4:48 p.m. on February 5, 2012, Wayne County 911 received a call from Hockett that K.H. was not breathing. Emergency Medical Technicians ("the EMTs") responded two minutes later and found Hockett on the porch and Pierson inside with K.H. The EMTs observed that K.H. was not breathing, had no pulse, was stiff, and his skin was cool to the touch. The child appeared "very, very, very, very skinny," "every bone was visible through the skin," and his skin was dry and leathery. *Id*. at 464, 510. K.H. had sunken eyes that were fixed and dilated. The EMTs and the paramedic who responded opined that K.H. was

3

already dead and rigor mortis had already set in. *Id*. at 468, 500, 506, 512. They still attempted resuscitation as they transported K.H. to the hospital. An EKG machine in the ambulance showed no signs of heart activity at that time.

When K.H. arrived at Reid Memorial Hospital, emergency room doctor Amid Shayestah ("Dr. Shayestah") tried, but was unable to intubate K.H. due to the rigor mortis. Dr. Shayestah was not able to find a pulse or detect any heart activity. After additional efforts at resuscitation, K.H. was pronounced dead. Although Dr. Shayestah had no opinion as to the cause of death, he observed K.H. to be frail, malnourished, and emaciated. The doctor also observed that K.H.'s bones were visible through his skin, he lacked fat, and was not clean. Dr. Shayestah also saw sores and ulcers on K.H.'s bottom and back, which indicated the baby had been subjected to prolonged pressure on one spot. K.H.'s weight at death was 6 pounds, 1 ounce. When notified of K.H.'s death, Hockett told the doctor that K.H. had been having problems keeping formula down and had been evaluated at the Pediatric Center a month prior for the condition. Hockett further claimed that K.H. was supposed to be on Zantac for the condition and that a follow-up appointment had been scheduled.

After K.H.'s death, both Hockett and Pierson made a statement to the police and a coroner's investigator and claimed that K.H.'s low weight was due to gastro-esophageal reflux disease, which caused him to spit up what he ate. Both parents stated that K.H. had been seen three times at the Pediatric Center and twice at the Wayne County Health Clinic. They claimed these were well-child visits as well as clinic visits for high fever and diarrhea. They stated they were feeding K.H. on a regular basis, including a 6:00 a.m. feeding on the

4

morning of his death of six to eight ounces of formula mixed with cereal and an additional two ounces around 8:30 a.m. They said that K.H. was placed in an infant swing for the rest of the day to help with digestion. They noticed he was not breathing when they went to check on him in the late afternoon.

The police searched Hockett's home and found the infant swing where K.H. had been placed. The cloth cover on the seat of the swing was wet and "had the smell of urine." *Id*. at 535. A "dripping wet" diaper was located on the floor near the swing and was found to weigh two-thirds of a pound. *Id*. at 680. There was a strong odor of urine in K.H.'s room, particularly near the swing. The diaper found on the floor was a different size than the "pristine" diaper K.H. was wearing when taken to the hospital. *Id*. at 721, 735. There was a bottle on the floor near the swing with "some dried material that was white." *Id*. at 677. The officers found eleven bottles total in the house, which were all dirty and some of which "may have had a little bit of liquid, but for the most part [were] all dried up." *Id*. at 683.

An autopsy was performed on K.H. by Dr. Elmo Griggs ("Dr. Griggs") on February 6, 2012. Dr. Griggs found K.H. to be well-developed, but extremely malnourished. The doctor observed that K.H. was cachectic, which meant that he was suffering from the end stage of malnutrition and wasting away of the body. *Id*. at 928. During the external examination, Dr. Griggs observed poor hygiene, an enlarged head, dry and wrinkled skin, dry mucous membranes, and dry whites of the eyes. K.H. was extremely dehydrated and had a rash around his genitals, an infection on the end of his penis, and bed sores on his

lower back.  Dr. Griggs stated that the bed sores could be from being left on his back or from staying in a wet or soiled diaper too long.  *Id*. at 931.

During the internal examination, Dr. Griggs observed that K.H.'s subcutaneous tissue was all dehydrated, that K.H. had very little fat, and that his organs were all small and wasting due to starvation.  *Id*. at 933, 934, 936-37.  In his stomach, the doctor found "a few flecks" of white material that could have been milk or formula.  *Id*. at 938.  There was also some stool in the large intestine.  K.H.'s lungs were found to be unobstructed, but a microscopic examination showed "acute bronco pneumonia."  *Id*. at 936.

Dr. Griggs determined the cause of death to be acute bronco pneumonia, caused by "severe malnutrition leading to the dehydration."  *Id*. at 943.  The doctor ruled out natural causes, genetic causes, and malabsorption of food or liquid.  Protein was found in K.H.'s urine, which Dr. Griggs stated indicated that K.H. was in the final stages of wasting away where the body had run out of fat and was burning muscle for energy.  *Id*. at 969-70.

On February 15, 2012, the State charged Hockett with murder and Class A felony neglect of a dependent.  On December 7, 2012, following the omnibus date, the State amended the information to add language to both charges alleging the crimes occurred: "by failing to provide proper nutrition and/or failing to provide proper hydration and/or failing to provide proper medical care and/or failing to obtain proper medical intervention and/or failing to provide sanitary living conditions and/or failing to provide proper daily care of [K.H.]."  *Appellant's App*. at 202.  The State also added a third count alleging neglect of a dependent as a Class D felony.  Because this amended information was filed after the omnibus date, the trial court set a hearing to determine whether the amendment "prejudices

6

the substantial rights of [Hockett] and whether or not a continuance is requested and/or warranted." *Id.* at 204. Hockett, however, filed a waiver of an initial hearing on the amended information and stated that she did not request a continuance. *Id.* at 205-06. The trial court granted Hockett's waiver on December 13, 2012 and entered a preliminary plea of not guilty on the new charge. *Id.* at 207.

A jury trial was held, at the conclusion of which Hockett was found guilty of all three counts. The trial court merged the neglect convictions into the murder conviction. Hockett was sentenced to sixty years executed for her murder conviction. Hockett now appeals. Additional facts will be added as necessary.

## DISCUSSION AND DECISION

### I. Amendment of Charging Information

Hockett asserts that the trial court erred when it permitted the State to amend the charging information after the omnibus date. Hockett concedes that she failed to object to the State's notice to amend the information and that she actually waived any hearing thereon. In order to preserve the issue for appeal, a defendant must request a continuance in addition to making an objection to a trial court's grant of a motion to amend. *Wright v. State*, 690 N.E.2d 1098, 1104 (Ind. 1997). "[A] defendant's failure to request a continuance after a trial court allows a pre-trial substantive amendment to the charging information over defendant's objection results in waiver." *Wilson v. State*, 931 N.E.2d 914, 918 (Ind. Ct. App. 2010), *trans. denied.* In an attempt to avoid waiver, Hockett argues that the trial court committed fundamental error when it permitted the State to amend the information. The doctrine of fundamental error is only available in egregious

7

circumstances. *Absher v. State*, 866 N.E.2d 350, 355 (Ind. Ct. App. 2007) (citing *Brown v. State,* 799 N.E.2d 1064, 1068 (Ind. 2003)). "The mere fact that error occurred and that it was prejudicial will not satisfy the fundamental error rule." *Id*. (citing *Purifoy v. State,* 821 N.E.2d 409, 412 (Ind. Ct. App. 2005), *trans. denied*). "To qualify as fundamental error, 'an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible' and must 'constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process.'" *Id*. (quoting *Benson v. State,* 762 N.E.2d 748, 755 (Ind. 2002) (internal quotations and citations omitted)).

Hockett argues that the trial court committed fundamental error when it allowed the State to amend the information after the omnibus date. She contends that the amendment was substantive and should not have been allowed because it prejudiced her substantial rights because it added a new Class D felony neglect charge and included new language to the two other charges that amounted to "matter of substance." *Appellant's Br*. at 12. Hockett asserts that the amendment permitted her substantial rights to be prejudiced because it had a direct impact on the nature of the evidence that was presented to the jury. She alleges that the amendment opened the door for the use of Indiana Evidence Rule 404(b) evidence concerning the medical records of her other child, D.H.

Indiana Code section 35-34-1-5 deals with substantive amendments to the charging information:

> (b)    The indictment or information may be amended in matters of substance and the names of material witnesses may be added, by the

prosecuting attorney, upon giving written notice to the defendant at any time:

(1) up to:
(A) thirty (30) days if the defendant is charged with a felony; or
(B) fifteen (15) days if the defendant is charged only with one (1) or more misdemeanors;

before the omnibus date; or

(2) before the commencement of trial;

if the amendment does not prejudice the substantial rights of the defendant. When the information or indictment is amended, it shall be signed by the prosecuting attorney or a deputy prosecuting attorney.

Ind. Code § 35-34-1-5(b). "In general, Indiana Code section 35-34-1-5(b) permits the State to amend a charging information even in matters of substance at any time before the commencement of trial so long as the amendment does not prejudice the defendant's substantial rights." *Gaby v. State*, 949 N.E.2d 870, 874 (Ind. Ct. App. 2011). The "substantial rights" of a defendant include a right to sufficient notice and an opportunity to be heard regarding the charge. *Id.* "'Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges.'" *Id.* (quoting *Brown v. State,* 912 N.E.2d 881, 890 (Ind. Ct. App. 2009), *trans. denied*). The substantial rights of the defendant are not prejudiced if: (1) a defense under the original information would be equally available after the amendment, and (2) the defendant's evidence would apply equally to the information in either form. *Id.* Our Supreme Court has also stated that "an amendment is of substance only if it is essential to making a valid charge of the crime." *McIntyre v. State,* 717 N.E.2d 114, 125-26 (Ind. 1999).

In the present case, Hockett does not argue that she lacked a reasonable opportunity to prepare a defense against the charges; instead, she asserts that the amendment permitted the State to present otherwise inadmissible 404(b) evidence concerning the medical records of her older son, D.H., which indicated that D.H. had been diagnosed with failure to thrive and what medical care he had been given. Hockett does not argue how her defense would have been different had the amendment not been permitted. She merely contends that certain evidence would not have been admitted if the amendment would not have been allowed. However, such evidence would have been admissible even if the amendment was not permitted because the medical evidence demonstrated that poor living conditions and lack of intervening medical care contributed to K.H.'s death.

Additionally, the amendment did not even constitute a substantive change to the information. "An amendment is one of form and not substance 'if a defense under the original information would be equally available after the amendment and the accused's evidence would apply equally to the information in either form.'" *Absher*, 866 N.E.2d at 353. An amendment is of substance only if it is essential to making a valid charge. *Id*. Here, the amendment added specific factual allegations, which had previously been missing, and separated the lesser-included offense of Class A felony neglect of a dependent resulting in death into a separate charge of Class D felony neglect of a dependent. *See* Ind. Code § 35-46-1-4. This amendment did not constitute a substantive change as all prior defenses were still available, and Hockett's evidence would have still applied. An amendment that does not prejudice the substantial rights of the defendant may be made at any time. Ind. Code § 35-34-1-5(c). Hockett has not shown that the trial court committed

10

fundamental error when it permitted the State to amend the information after the omnibus date.

## II. Sufficient Evidence

Our standard of review for sufficiency claims is well settled. When we review a claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Parahams v. State*, 908 N.E.2d 689, 691 (Ind. Ct. App. 2009) (citing *Jones v. State*, 783 N.E.2d 1132, 1139 (Ind. 2003)). We look only to the probative evidence supporting the judgment and the reasonable inferences therein to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Id.* If there is substantial evidence of probative value to support the conviction, it will not be set aside. *Id.* It is the function of the trier of fact to resolve conflicts of testimony and to determine the weight of the evidence and the credibility of the witnesses. *Yowler v. State*, 894 N.E.2d 1000, 1002 (Ind. Ct. App. 2008).

Hockett argues that the State failed to present sufficient evidence to support her conviction for murder. She specifically contends that the evidence did not support a finding that she knowingly killed K.H. She asserts that the evidence showed that K.H. had some amount of milk or formula in his stomach and stool in his large intestine, that K.H. had been seated in a urine-soaked swing, and that she informed the investigators that K.H. was placed in the swing due to his tendency to vomit after feedings. Hockett claims that this evidence demonstrated some amount of feeding of, caring for, and thought to protect K.H., which runs counter to a finding of a knowing killing.

11

In order to convict Hockett of murder, the State was required to prove beyond a reasonable doubt that she knowingly killed K.H. Ind. Code § 35-42-1-1. "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2. "It is well established that '[t]he element of intent may be proven by circumstantial evidence alone, and it is well established that knowledge and intent may be inferred from the facts and circumstances of each case.'" *Scott v. State*, 867 N.E.2d 690, 695 (Ind. Ct. App. 2007) (quoting *Lykins v. State*, 726 N.E.2d 1265, 1270-71 (Ind. Ct. App. 2000)), *trans. denied*. Also, one is presumed to have intended the reasonable results of his or her own acts. *Norris v. State*, 943 N.E.2d 362, 370 (Ind. Ct. App. 2011) (citing *Heavrin v. State*, 675 N.E.2d 1075, 1079 (Ind. 1996)), *trans. denied*.

The evidence presented at trial showed that, at the time of his death, K.H. was in the final stages of wasting where his body has run out of fat to use for energy and has started to burn muscle. In the four months since his birth, K.H. had lost 2 pounds, 6 ounces, when he should have been gaining weight at the rate of half an ounce to one ounce a day. Dr. Griggs ruled out natural causes, genetic causes, and malabsorption of food as the cause of K.H.'s death. He ruled that K.H. had died due to acute bronco pneumonia, caused by severe malnutrition leading to severe dehydration. *Tr.* at 943.

Additionally, evidence of K.H.'s living conditions showed that he lived in a house described as dim, filthy, and messy, with clothing and dog feces on the floor, piles of dishes with dried food, feces smeared on the wall and windows, overflowing trash, and a strong odor of urine and feces. Hockett admitted that she left K.H. for long periods of time in the

12

infant swing, which a pediatrician testified should not be used for more than twenty to thirty minutes at a time. *Id*. at 647. The cloth seat cover on the swing was wet and smelled of urine, and a dripping wet diaper was found on the floor near the swing. It could be inferred that these conditions contributed to K.H.'s death since he was suffering from bed sores and an infection in his diaper area and had possibly contracted pneumonia from the bacteria in the environment. *Id*. at 930-32, 945.

The evidence also showed that there was a bottle on the floor near the swing that contained some dried white material. Officers found eleven bottles in total in the house, all of which were dirty. Some may have contained a little bit of liquid, but for the most part they were all dried up. *Id*. at 683. During the autopsy, Dr. Griggs found only "a few flecks" of white material that could have been milk or formula in K.H.'s stomach and some stool in his large intestine. While this evidence does show that K.H. had at some point received food, it also supported an inference that the feedings were not recent or regular.

Further, the evidence showed that, at the time of his death, K.H. appeared "very, very, very, very skinny" with "every bone visible" and leathery skin and sunken eyes. *Id*. at 464, 510. Hockett's mother, former step-father, and a close friend testified that they had observed K.H. and expressed concerns about his size, but were told by Hockett that K.H. was receiving medical treatment. *Id*. at 837-38, 855, 895-96. Hockett claimed that doctors suspected that K.H. had and that he was being tested for, acid reflux, lactose intolerance, food allergies, leukemia, an immune disorder, a blood disorder, and kidney stones. *Id*. at 838, 855, 857-58, 861-63, 895-97. Although Hockett told her family and friends that K.H. was receiving medical treatment and had stated to the police that K.H. had been seen three

13

times at the Pediatric Center and twice at the Wayne County Health Clinic, neither facility had any record of K.H. receiving treatment or having seen K.H. other than his one week well-child visit. *Id.* at 583, 641, 799-800. Evidence was also presented that Hockett was aware of the medical needs of a child, including a child with digestive problems, because one of her older children had digestive problems and received hospital care and medicine to help the child gain weight. *Id.* at 771-78. During the trial, three doctors testified that K.H. should have been immediately hospitalized based solely on his "critically low rate" of growth. *Id.* at 636-37, 658, 762. This evidence supported an inference that Hockett failed to seek medical care for K.H. We therefore conclude that all of this evidence was sufficient to support the jury's finding that Hockett knowingly killed K.H. and to support her conviction for murder.

### III. Inappropriate Sentence

"This court has authority to revise a sentence 'if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.'" *Delao v. State*, 940 N.E.2d 849, 853 (Ind. Ct. App. 2011) (quoting Ind. Appellate Rule 7(B)), *trans. denied*. "Although Indiana Appellate Rule 7(B) does not require us to be extremely deferential to a trial court's sentencing decision, we still must give due consideration to that decision." *Patterson v. State*, 909 N.E.2d 1058, 1062-63 (Ind. Ct. App. 2009) (quoting *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007)). We understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* at 1063. The defendant bears the burden of persuading this court that his or her sentence is inappropriate. *Id.*

14

Hockett argues that her sixty-year sentence is inappropriate in light of the nature of the offense and the character of the offender. She concedes that the nature of the offense, the death of K.H., a four-month-old child, is horrific. However, she contends that with respect to her character, her sentence is inappropriate. She asserts that she had no criminal or juvenile history prior to the underlying proceedings, that she has suffered from mental health issues, and that she had alcohol and drug problems.

Regarding the nature of the offense, the crime involved a very young child and a violation of a position of trust. Dr. Griggs testified that K.H. was subjected to a three-month long process of starvation and malnutrition where his muscles and organs slowly wasted. *Tr.* at 946. Throughout these three months, Hockett never sought medical care or treatment for K.H. K.H. also suffered from bed sores, a rash, and infection in his diaper area that resulted from spending most of his life in wet diapers and in an infant swing. Further, although K.H.'s appearance caused family and friends to question Hockett about his well-being, she lied and told them he was receiving medical treatment, which effectively ensured that family and friends would not intervene.

With respect to Hockett's character, she is correct that she did not have any juvenile or criminal history prior to the present offense. However, the evidence showed that she was a serious drug user, who used marijuana daily and heroin three to four times a week following K.H.'s birth. She also admitted to abusing methamphetamine, pain killers, and cough medicine. Hockett's poor character is also demonstrated by her repeated lying to family and friends about K.H. receiving medical treatment. Further, the trial court found that Hockett showed a "complete lack of remorse amounting to disdain or recalcitrance."

*Appellant's App.* at 289.  In light of the nature of the offense and the character of the offender, we conclude that Hockett's sixty-year sentence was not inappropriate.

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.